Herman CORN, Plaintiff–Appellant,
Cross–Appellee,

v.

CITY OF LAUDERDALE LAKES,
Defendant–Appellee, Cross–
Appellant.

No. 91–6011.

United States Court of Appeals,
Eleventh Circuit.

Aug. 13, 1993.

Andrew T. Lavin, Romanik and Lavin, Hollywood, FL, for plaintiff-appellant.

Michael C. Mattson, Cooney, Haliczer, Mattson, Lance, Blackburn, Pettis & Rich-

ards, P.A., Ft. Lauderdale, FL, Morgan Lewis & Bockus, Nancy A. Copperthwaite, Miami, FL, for defendant-appellee.

Before HATCHETT, DUBINA and CARNES, Circuit Judges.

CARNES, Circuit Judge:

This case involves a zoning dispute between the City of Lauderdale Lakes, Florida, and a developer, a dispute that has generated a large volume of litigation in state and federal courts during the past sixteen years. In this latest chapter, the district court has found that the City's zoning actions violated the developer's substantive due process rights and, after dismissing the claims against individual City Council members, the district court has awarded damages against the City. The developer has appealed contending that the district court awarded insufficient damages and should not have dismissed the Council members. The City has cross-appealed on the liability issue. We hold that the district court erred in concluding that the City's zoning actions violated substantive due process, and we reverse on that basis, which renders moot the developer's appeal of the damages calculations. We also conclude that the district court erred in part in dismissing the City Council members on legislative immunity grounds and reverse its judgment on that basis as well.

I. INTRODUCTION

The property involved in this case is an 8.5 acre parcel ("the property") that abuts a state highway, a residential condominium complex, and a neighborhood of single family dwellings. The property, along with a much larger tract of land of which it was a part, was annexed by the City in 1966 with the support of the developer, Herman Corn, who sought to increase the value of his holdings. The City originally zoned the property to permit commercial use subject to approval of the City. The property lay idle for years, as Corn developed the adjacent land by selling condominium units and single-family dwellings to the citizens of Lauderdale Lakes. In 1977, Corn submitted to the City a site plan proposing to develop the property into a 67,000 square foot strip shopping center, and behind that, a 900–unit, 103,000 square foot mini-warehouse facility.

The City's Planning and Zoning Board reviewed the site plan for compliance with technical requirements, and after requesting several changes, recommended approval to the City Council. The City Council returned the site plan to the Board for further review, and the Board again recommended approval. Before voting on the site plan, the City Council and the City Building Committee held public hearings at which residents of the neighborhoods adjoining the proposed development voiced strong opposition to the plan, primarily to the mini-warehouse part of it. After discussing the matter at length and hearing from all sides, the City Council at a July 12, 1977 meeting adopted on first reading two ordinances which affected the property. The first ordinance eliminated mini-warehouses as a permitted use within the relevant zoning classification, and the second one changed the zoning on the property to a more restrictive business classification. Under Council procedures, those two ordinances were not finally enacted and did not become effective until September of 1977. At the same July 12 meeting, and before the two ordinances took effect, the Council voted unanimously to deny approval of Corn's site plan. The next week, the Council adopted a third ordinance, this one imposed a 150–day city-wide moratorium against construction on property in the applicable zoning classification in order to permit completion of a study on the propriety of commercial zoning in residential areas. These actions spawned the litigation that continues to this day.

Herman Corn filed a lawsuit in a Florida state court in August of 1977 challenging the validity of the three ordinances adopted in July and the City's denial of his site plan. After a trial, the state court found that Corn's reliance on the zoning classification of the property in preparing it for development established Corn's vested right to the development and equitably estopped the City from denying approval of the site plan. The court declared the ordinances invalid, directed the

City to approve the site plan, and ordered a building permit to be issued after the correction of some technical defects in the plan. That judgment was affirmed by a Florida court of appeals. Then a dispute arose over the City's insistence that Corn comply with a subsequently enacted platting ordinance. After additional litigation, the state court ordered the City to approve the site plan despite Corn's failure to comply with the platting ordinance. Since that time, March of 1985, Corn has had the right to begin development of the property in the fashion he originally intended. Instead of developing the property, however, Corn filed this lawsuit under 42 U.S.C. § 1983 seeking damages for the City's delay in approving development of his property.

Corn's complaint stated four causes of action: an equal protection claim; a Fifth Amendment just compensation claim; a substantive due process claim; and a procedural due process claim. Named as defendants were the City and its Council members in their individual capacities. Corn later voluntarily dismissed his equal protection and procedural due process claims, and was left with a just compensation claim and a substantive due process claim.

The district court first dismissed Corn's action on ripeness grounds. This Court reversed that determination. *Corn v. City of Lauderdale Lakes*, 816 F.2d 1514 (11th Cir. 1987). On remand, the City renewed its motions to dismiss for failure to state a claim and for summary judgment claiming that the action was barred by res judicata, by the statute of limitations, and as to the individual City Council members, by legislative immunity. The district court granted the motion to dismiss the individual City Council members on legislative immunity grounds. The court refused to grant summary judgment or a 12(b)(6) dismissal to the City based on the statute of limitations and res judicata, but certified its denial as an appealable interlocutory order. This Court affirmed the denial, holding that the action was not barred by res judicata or the statute of limitations. *Corn v.*

*City of Lauderdale Lakes*, 904 F.2d 585 (11th Cir.1990). The case was remanded to the district court again, this time for trial.

The district court then held a non-jury trial, after which it entered findings of fact and conclusions of law. *Corn v. City of Lauderdale Lakes*, 771 F.Supp. 1557 (S.D.Fla.1991). The district court entered judgment for Corn on the substantive due process claim, finding that the City had acted arbitrarily and capriciously in denying approval of Corn's site plan. The court reserved judgment on the Fifth Amendment just compensation claim, because it considered the calculation of damages under either count to be identical and, thus, judgment on the substantive due process claim served to make Corn whole. The court set damages in the amount of $727,875.02.

Corn filed a motion to amend the findings of fact and conclusions of law. The court granted the motion, in part, to make clear that the individual Council members had been dismissed on legislative immunity grounds earlier. The district court denied the motion in all other material respects, and reaffirmed its findings, noting that Corn's motion was largely an improper attempt to take a "second bite at the apple."

Corn, seeking the entire apple, filed this appeal challenging the district court's calculation of damages as well as the dismissal of the individual Council members. The City cross-appealed, arguing that the trial court erred in concluding that the City acted arbitrarily and capriciously thereby violating Corn's substantive due process rights. The City also asks us to revisit our earlier determination that Corn's substantive due process claim is not barred by the statute of limitations, 904 F.2d 585, arguing that that prior holding is not the law of the case. We need not address that contention, because our holding that the district court erred in finding a violation of substantive due process renders the City's statute of limitations attack superfluous.[1] Because Corn's just compensation claim remains to be adjudicated on remand, his contention that the district court

---

1. The City also reiterates its position that this Court erred in its holdings that Corn's entire lawsuit is not barred on grounds of res judicata, 904 F.2d 585, or ripeness, 816 F.2d 1514, but those contentions are clearly foreclosed by the law of the case doctrine.

erred in dismissing the Council members on legislative immunity grounds must be addressed. We decide that the district court erred in dismissing on that ground, but only insofar as denial of the site plan is concerned.

## II. STANDARD OF REVIEW

■ "[T]he ultimate issue of whether a zoning decision is arbitrary and capricious is a question of law to be determined by the court. Although subsidiary facts are properly for the factfinder, the ultimate issue is for the court." *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1578 (11th Cir.1989). Thus, facts determined by the district court are to be respected unless they are clearly erroneous, but our review of the district court's application of law to those facts, including the ultimate determination of whether an action is arbitrary and capricious, is plenary. *See In re Grand Jury Subpoena*, 957 F.2d 807, 809 (11th Cir.1992); *Stephens v. Department of Health and Human Servs.*, 901 F.2d 1571, 1573 (11th Cir.), *cert. denied*, 498 U.S. 998, 111 S.Ct. 555, 112 L.Ed.2d 562 (1990). The same is true of the legislative immunity issue.

## III. DISCUSSION OF THE LIABILITY ISSUE

■ The district court's holding, that the City's refusal to permit Corn to proceed with construction of a 900–unit mini-warehouse development in a residential area violated the Due Process Clause of the United States Constitution, *Corn v. City of Lauderdale Lakes*, 771 F.Supp. 1557 (S.D.Fla.1991), is due to be reversed. The burden is on a developer seeking to establish a substantive due process claim to prove that the governmental body acted arbitrarily and capriciously in refusing permission for the development. The record shows that Corn failed to carry that burden, and it also affirmatively shows that the City did not act arbitrarily and capriciously.

The district court's error reaches beyond the fisc of one Florida community and the merits of one case. Faithfulness to the teachings of prior decisions of this Court, and thus to the rule of precedent, is also at stake. More broadly, this case involves questions about how decisionmaking is allocated between a democratic institution, such as an elected city council, and the federal courts. It involves fundamental issues about the allocation of rights and powers within our constitutional system. Those issues and questions have all been answered by controlling precedent, but contrary to the way the district court answered them in this case.

### A. THE GENERAL LAW APPLICABLE TO LAND USE RESTRICTIONS

Rights do not exist in a vacuum but are defined in a reciprocal relationship to other rights. In land use matters, for example, the rights of a developer are defined in relation to the rights of the constituents of the municipal government to regulate and control the development of land in the community for the greater good as defined by the majority. Of course, the minority, in this case the developer, is not wholly dependent upon the tender mercies of the majority for the definition and protection of the minority's rights. To some extent the minority's rights are protected from majority encroachment by state law enforced through the state court system. In this case, the developer has had resort to those courts to claim his state law protection. Having secured an enforceable state law judgment requiring the City to issue him a building permit on his terms, the developer has decided not to utilize that judgment and pursue the development. Instead, he has pursued a money judgment for the alleged infringement of his rights—not his rights under state law, but his rights under the Constitution.

The Constitution's allocation or adjustment of the reciprocal rights of developers and the community's majority has been settled to a considerable extent in a number of court decisions. Insofar as the Constitution is concerned, a municipal government may control the use of land within its jurisdiction for what it perceives to be the common good, subject only to four restrictions. These four restrictions define the limits of constitutional rights a developer has and thus the constitutional claims he may make against the gov-

ernmental entity that has restricted his use of land:

1. the Fifth Amendment right not to have his land taken without just compensation (a "just compensation" claim);

2. the Due Process Clause right not to have the use and value of his land infringed upon to such an extent that it is tantamount to having been taken by eminent domain (a "due process takings" claim);

3. the Due Process Clause right not to have his use of the land restricted arbitrarily and capriciously, which is a right not to have his use of his land restricted for reasons having no substantial relation to the public health, safety, morals, or general welfare (a "substantive due process" or "arbitrary and capricious due process" claim);

4. the Equal Protection Clause right not be treated in a way that violates that clause (an "equal protection" claim).

*Eide v. Sarasota County,* 908 F.2d 716, 720–23 (11th Cir.1990), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991); *Executive 100, Inc. v. Martin County,* 922 F.2d 1536, 1540 (11th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991). Subject to those four limitations, the Constitution does not prevent a local government from restricting, controlling, or limiting the development of land to promote what it perceives to be the general welfare interests of the community as a whole.

## B. SUBSTANTIVE DUE PROCESS LAW APPLICABLE TO LAND USE RESTRICTIONS

In the district court Corn pressed two claims, a just compensation claim and also a substantive due process claim, which he termed his "main claim." The district court granted judgment in favor of Corn on the substantive due process claim and did not reach the just compensation claim. We have before us for review the district court's holding that in restricting use of his land the City violated Corn's substantive due process rights.

The law in this Circuit is settled, and the parties do not disagree, that there are two components to such a claim. As this Court has said:

> The current test in this circuit as to whether there has been a violation of substantive due process in the context of § 1983 is twofold. First, it must be determined whether there has been a deprivation of a federal constitutionally protected interest, and secondly, whether the deprivation, if any, is the result of an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation.

*Rymer v. Douglas County,* 764 F.2d 796, 801 (11th Cir.1985), *quoted in Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1577 (11th Cir.1989). Applying this test, the district court found that Corn had established both the constitutionally protected interest component and the sufficient abuse of government power component. The two components of the substantive due process test are conjunctive, and a reviewing court finding an absence of one component need not decide whether the other exists. *See, e.g., Greenbriar,* 881 F.2d at 1577 ("In light of our disposition of this case on the basis of the second prong of this test, we need not address the first prong.") (footnote omitted).

We need not address questions about the first component, because the district court erred in finding that Corn had carried his burden of proving the second component of a substantive due process claim. The reason a substantive due process claim is also called an "arbitrary and capricious due process claim" is because a showing that the government has acted arbitrarily and capriciously is a prerequisite for such a claim. That is what the second component requires: The plaintiff developer must show that the defendant government or government officials abused power by acting arbitrarily and capriciously, which means that the action "does not bear a substantial relation to the public health, safety, morals, or general welfare." *Eide,* 908 F.2d at 721. This particular requirement, which is dispositive of the present case, was discussed by this Court less than four years ago in the closely analogous *Greenbriar* case:

> It has long been established that zoning regulations will not be declared unconstitu-

tional as violative of substantive due process unless they "are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, [394,] 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926)....

... [C]ourts have held that a deprivation of a property interest is of constitutional stature if it is undertaken " 'for an improper motive and by means that were pretextual, arbitrary and capricious, and ... without any rational basis.' " *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989) (quoting *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir.1982)).

881 F.2d at 1577. The law has not changed since our *Greenbriar* decision, and Corn does not argue that it has.

The law is also settled that certain interests will provide a rational basis for governmental action restricting land use. The Supreme Court has held that restrictions may be imposed in order to protect "family values, youth values, and the blessings of quiet seclusion." *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974). Legitimate zoning interests also include protection from the "ill effects of urbanization," *Agins v. City of Tiburon*, 447 U.S. 255, 261, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980), the exclusion of industry from residential areas, *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and the regulation of traffic, *City of Memphis v. Greene*, 451 U.S. 100, 126–29, 101 S.Ct. 1584, 1600–01, 67 L.Ed.2d 769 (1981), and noise, *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The exercise of police power in this area is not narrowly constrained, because

[t]he concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.

*Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 102–03, 99 L.Ed. 27 (1954) (citation omitted).

▪ This Court has held that permissible bases for land use restrictions include concern about the effect of the proposed development on traffic, on congestion, on surrounding property values, on demand for city services, and on other aspects of the general welfare. *Greenbriar*, 881 F.2d at 1580 & n. 20; *Spence v. Zimmerman*, 873 F.2d 256, 260 (11th Cir.1989) (Protection of surrounding neighborhoods from economic, environmental, and aesthetic harm is legitimate.); *Grosz v. City of Miami Beach*, 721 F.2d 729, 738 (11th Cir.1983) (Restriction on organized religious gatherings in residential areas serves zoning interests of reduced traffic, noise, and litter.), *cert. denied*, 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984). Other circuits have also recognized the breadth of the "public welfare" concept. *See, e.g., Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1224 (6th Cir.1992) ("[C]oncerns about traffic and the deterioration of the neighborhood [as a result of a proposed zoning change to permit a fast food restaurant] are rationally related to the goals of zoning." The *Pearson* opinion contains an excellent circuit-by-circuit summary of substantive due process zoning cases.); *Rogin v. Bensalem Township*, 616 F.2d 680, 689–90 (3d Cir.1980) (holding that the defendant township had "a legitimate interest in controlling population growth and density and the zoning amendments [at issue were] a rational and reasonable means to accomplish that purpose"), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *Construction Indus. Assoc. v. City of Petaluma*, 522 F.2d 897, 905–09 (9th Cir. 1975) (Land use may be governed in order to preserve small town character and avoid problems associated with uncontrolled growth.), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976).

▪ Although it is broad, the power of government to control land use and development is not without limitation. The four constitutional doctrines that limit government power in the land use area already have been mentioned. This case concerns the fourth limitation, substantive due process

doctrine, which prevents a government from restricting land use for no reason, or for an illegitimate reason such as corruption, racial or ethnic prejudice, or any other illegitimate motivation. *See Greenbriar,* 881 F.2d at 1579 n. 18. The restrictions a government imposes on land use must be substantially related to the general welfare. If not, the governmental action is arbitrary and capricious in violation of substantive due process.

The question posed by the facts of this case is whether the City Council's purposeful action to prevent Corn from building a 900–unit mini-warehouse in a residential area was rationally based upon, *i.e.,* was substantially related to, general welfare interests such as the effect that development would have on congestion, traffic, noise, city services, aesthetics, and surrounding property values. The record facts permit only one correct answer to that question. Because the facts determine this appeal, and because the district court clearly erred in regard to them, we set the facts out in considerable detail. Virtually all of them are undisputed and are drawn from official records admitted into evidence.

### C. THE FACTS RELEVANT TO THE SUBSTANTIVE DUE PROCESS ISSUE

When the City agreed to annex Corn's property and to give it a permissive zoning classification, the City was concerned about how Corn would use the property, and it created a new zoning category, C–1A, specifically for that property. The new zoning category reserved for the City the right to control the use of Corn's property. Herman Corn himself admitted that under his agreement with the City, "anything we put in there would first have to be approved by the Council." The property is a parcel of land approximately 8.5 acres in area and bounded by a highway on its east side. To the west of the property lies a complex of single family homes separated from the property by a canal. A condominium complex lies to the north and is also separated from the property by a canal. Corn was the developer for these residential complexes which border his proposed warehouse site.

Even with the right of prior approval reserved to the City, there were early concerns about the zoning of Corn's property. In the 1970s, the City was required to submit a master land use plan to the county. In July of 1975, while the City Council was considering such a plan, Michael Shiff, a land use consultant the City had hired to draft its master land use plan, reported to the Council that it should not zone Corn's land in a way that would permit warehouses that close to a residential development. Shiff recommended that Corn's property should be rezoned, because C–1 and C–1A commercial development (light industrial usage), should not be permitted next to residential areas. He specifically reported: "I don't think you want to put warehouses where you have existing residential development." The City incorporated Shiff's position into the interim land use plan it adopted and transmitted to county officials, who in turn incorporated it into the interim county plan. The City did not move to rezone the property at that time, because no development was pending, and it was assumed the problem would be taken care of in the final master land use plan that would eventually be developed. As it turned out, the final land use plan was not adopted until 1979.

Corn submitted his first site plan for the development of the property in 1976; the details of it are not clear from the record. Although the Planning and Zoning Board recommended approval of the plan to the City Council, the public opposition to it at a hearing called to consider the plan caused Corn to withdraw it.

In January of 1977, the City Council and the Planning and Zoning Board conducted a joint meeting to discuss the master land use plan that was still being developed for the City. Milton Scheingarten, an architect on the Planning and Zoning Board, had discovered that Corn's property was improperly zoned, because elementary principles of land use planning require a buffer between residential areas and an industrial use, such as warehouses. The Planning and Zoning Board officially recommended to the City

Council in that January 1977 joint meeting that Corn's property be rezoned to a more restrictive classification, which would not permit warehouses. Some discussion concerning Corn's property and whether it should be rezoned to prohibit mini-warehouses ensued, but the issue was deferred until a later time.

In April of 1977, Corn submitted a new site plan to the City Council which included a mini-warehouse development as well as a shopping center. The City Council referred the site plan to the Planning and Zoning Board for a review for compliance with the requirements of City agencies. After Corn had made some, but not all, of the changes recommended by various City agencies, the Board on May 12, 1977 recommended to the City Council that it approve the site plan. The Council requested the Board to consider the plan again, apparently because of concern about fire truck access to the proposed mini-warehouse buildings and property, and the Board reconsidered the plan in a meeting held on May 26, 1977. The next day the Board again recommended approval of the site plan. The Board had five members but only three members voted; the vote was split two to one in favor of recommending approval.

Documents in the record establish, and it is undisputed, that under local law the three-member Planning and Zoning Board has no authority to make the ultimate decision concerning zoning or adoption of site plans. Instead, the authority to make such decisions is vested in the City Council. The Board makes recommendations, but those are merely advisory. The final decision about how land should be zoned and whether a particular development comports with the general welfare of the community is the decision of the City Council. The power to restrict the use of property involves an exercise of the police power, and the City Council alone has the authority to determine whether the general welfare of the community warrants exercise of that power.

In order to investigate whether Corn's proposed development was compatible with the general welfare of the City, the City Council held a number of meetings and pub-

lic hearings. Corn's son Stephen, who was deeply involved in the proposed development, attended these meetings and represented Corn's interests. Concerned citizens also attended these meetings and were permitted to speak for or against the proposed development. Most of the citizens who spoke were from the neighborhood adjoining the property, and they spoke against the plan, especially the mini-warehouse aspect of it. Various City officials were also questioned at these meetings about the planned development and the problems it would create. The subjects discussed by Stephen Corn, various citizens, and City officials included problems of congestion, traffic, noise, strain on city services, aesthetics, the character of the surrounding neighborhood, and property values.

### 1. *The May 31, 1977 City Council Meeting*

At a meeting on May 31, 1977, the City Council took up the Planning and Zoning Board's recommendation that Corn's site plan be approved. Council member Geréffi asked what would protect the residents of the adjacent condominiums from the mini-warehouses. He wanted to know if they would be looking at blank walls. Questions were also raised about fire hazards and about whether the mini-warehouses could later be turned into things such as second-hand stores. References were made to some 19th Street warehouses which had created traffic and parking problems. The City Council decided to table the proposal until more input could be obtained from residents of the City.

### 2. *The June 14, 1977 City Council Meeting*

At a City Council meeting on June 14, 1977, the issue was taken up again. Stephen Corn was present and answered questions from the Council members. Expressing concern about the mini-warehouses, Council member Gereffi pointed out that there were condominiums north of Corn's property, and he asked whether there would be big trucks going in and out of the warehouses at midnight, because if so, "these people living in these condominiums are going to have a headache." Corn responded that the ware-

houses would be closed at a certain time in the evening.

Council member Gereffi also questioned Stephen Corn about the setback directly in front of the canal between the condominiums and the warehouses and whether that setback was enough to insulate the residents of the condominiums from trucks going back and forth to the mini-warehouses. Council member Gereffi referred to a "Cypress Chase" incident where residents had been kept awake by noise either from air conditioning units on stores in front of them or from refrigerator units on trucks which were left on while the trucks unloaded next door to a residential area. Council member Gereffi asked if refrigerated trucks would be coming to the warehouses, and Stephen Corn said that there would be no reason for them to do so.

The City Council then discussed the reason that Mr. Scheingarten of the Planning and Zoning Board had dissented from the Board's recommendation that Corn's proposal be approved. Mr. Scheingarten dissented because he thought that the plan provided for insufficient parking space and fire truck access. A different member of the Planning Board told the Council that the plan did not provide for retail parking space because it was not intended to be a retail development. Council member Greenwald replied, however, that the property was zoned commercial, and he raised the possibility that Corn could later convert the mini-warehouse units into stores. The Mayor said:

[T]hat's exactly what happened on 19th St. They came in under the warehouse rules. The warehouse parking strips. After they had everything all built up, they turned them into retail stores, instead of warehouses. And that's the reason the parking is such an incredible mess on 19th St. I'm not suggesting that's what you all are intending to do, but it is a fact, that's how 19th St. got to be like it is. With the recommendation of the Planning and Zoning Board.

Because Mr. Scheingarten, the Planning Board member who had dissented from the recommendation of approval, was not pres-

ent, further consideration of Corn's plan was tabled.

### 3. *The June 21, 1977 City Council Meeting*

The third City Council meeting at which Corn's site plan was considered was held on June 21, 1977. At this meeting, Council member Gereffi and Stephen Corn engaged in a discussion about lane width and fire truck access. Council member Cohan was concerned that the planned development might be a potential firetrap because of inadequate space in the lanes and for parking. Gereffi also brought up the subject of refrigerated trucks again, and he asked about truck traffic at the warehouses:

You got the canal, you got north of the canal is condominiums. You're going to have trucks coming in. These people that bought these condominiums, came down here to live in quiet and peace. How much time, and how often is your trucks going to be running to the mini-warehouses. These are the people that's living in this City. These are the people we have to satisfy. These are the people who are going to have the headaches. As I said before, they came down to get away from ghetto areas. They come down to live in a beautiful condominium, they come down to have peace of mind. They retired with that intention. Now, you are going to have to satisfy these people on how the traffic that's going to be running back and forth, within 60 or 80 feet of your warehouses. These are the people who are going to have to be sitting up and taking notice of that, to look out the windows.

Stephen Corn answered by giving the setbacks that would exist from the buildings to the canal, the canal's width, the roadway, and so forth. He also said that at another larger mini-warehouse he had never seen more than fifteen people there at a time.

Several times during the meeting, Council members criticized Corn for not having met with the residents of the adjoining neighborhood to discuss their concerns with them and to satisfy them that his development was not going to ruin their property. He was reminded that those people were taxpayers and

voters. At this meeting, citizens were permitted to speak to the Council about Corn's proposed development, and a number of them did speak out in opposition to the plan. Most or all of those who spoke were residents of the neighborhood in which Corn wanted to build his mini-warehouses. One resident was concerned about noise and questioned whether there would be air conditioning units. That resident also expressed concern about the aesthetics and how the back of the warehouses would be landscaped. She also asked about recreational vehicles, like boats, and their storage.

Another resident asked about roadway access to the planned development, pointing out that it was narrow and could cause a "regular tie-up" if two cars met. He said, "[i]t will be a madhouse. . . . We spent a lot of money for those condominiums and it's a damnable shame what's happening there." Yet another resident expressed the fear that someone might rent several of the units, knock down their internal walls, and set up a manufacturing plant of some kind. A number of people spoke out about traffic problems and fire hazards that would be created by the mini-warehouses.

The Fire Chief was then asked about the plan, and he said that he was not happy with the lane widths and the space for parking, because it left little room for fire trucks to maneuver.

Finally, the proposal was tabled and referred to the Building Committee with the understanding that some meeting would be arranged with all interested parties invited to attend. Although the exact membership of that committee is unclear, the record does show that one or more Council members and one or more members of the Planning and Zoning Board were on the committee.

### 4. *The July 8, 1977 Building Committee Meeting*

On July 8, 1977, a meeting of the Building Committee was held and attended by members of the Planning Board, some Council members, and a number of local citizens. The meeting began with a presentation by Stephen Corn of the proposal for the site. A Planning Board member framed the issues

for the residents who were present. In doing so, he noted that the Planning Board had requested six months earlier that the Council rezone the property from its current very permissive zoning status, but as it now stood the Planning and Zoning Board had to make its recommendation about Corn's plan under the ordinances currently applicable to the property.

Many citizens made comments at this meeting in opposition to the mini-warehouse aspect of the planned development:

1. Mr. Zorban disputed Stephen Corn's statement that the Fire Department had said that it would have no difficulty gaining access to the development. He questioned the need for 900 mini-warehouses: "It looks awful, it is horrible, if we look out [at] those buildings there is nothing there to look at, it would be like barracks, a prison camp of some kind, it's horrible looking. Now we could beautify it if we put [in] half the amount."

2. Mrs. Schneider complained about the increased noise that would be caused, saying: "There are people who face that area. You're going to have trucks and everything coming in and out. That creates a noise problem too."

3. Another resident questioned whether their fire insurance rates would go up because of the proximity of the mini-warehouses.

4. George Hudson asked about the type of storage that would be permitted. A followup question by Council member Cohan asked whether there would be combustibles stored in the warehouses, and he was told that the landlord probably would not allow that.

5. Eileen Lefkowitz wanted to know whether Corn believed he would be able to rent 900 units of warehouse, and, if not, what his plans were. If he could not rent them, she feared he would tear the individual units down and build a big warehouse like the one on 19th Street. She said the mini-warehouses were "absolutely unnecessary" and not appropriate in a residential area.

6. Bob [last name unknown] raised concerns about the added noise and the traffic

hazard that would be caused by this project, and he also expressed concern about what Corn would do if the mini-warehouses didn't work. He was afraid that Corn would let people open up stores. He was generally concerned that mini-warehouses just did not fit into the neighborhood.

7. Mrs. Smith, who lived on the fourth floor of an adjacent condominium, said that she did not think any amount of landscaping would help her. She would be looking at the roof and 900 doors anyway. She also expressed concern about the inevitable street lighting that would be around the warehouses and said that the development would lower property values. She pointed out that the mini-warehouses she knew of were not in nice residential neighborhoods, and that the development would cause people to come and go at all hours. She noted that Stephen Corn himself was moving out of the neighborhood because he did not want to live in a "downtrodden area." She said that her opinions were shared by everyone who lived in the affected neighborhood.

8. Mr. Lamb said that he had had experience with mini-warehouses, and that he had never seen one in a residential area. He also said that he had seen lots of different little businesses, like television repair shops, being run out of mini-warehouses, and that people would do that on their own. He also expressed his opinion that the proposed development would create hazards, such as fire hazards, and that it did not belong in that area.

9. George Pearle said that although he thought the builder was "eminently within his rights," the question was whether it was "morally right." He stated that the salesman that had sold him his condominium had said the builder planned to declare the land behind the building to be a park or something like that, and he would not have bought his condominium had he known that Corn would attempt to develop the property this way.

10. Morris Davis said that the area was not suitable for any type of commercial use, that it was "unconscionable" for Corn to build a commercial complex so close to the condominiums, and that the rear portion of the lot should be rezoned to something other than commercial.

Council member Greenwald spoke about how the Corn family's development of the area had been unfair, because it had proceeded from construction of homes to condominiums and now to commercial warehouses, without telling people who bought along the way about the ultimate plan. Greenwald recommended that the matter be forwarded to the City Attorney to see if there was a way to avoid allowing this project to proceed next to residential areas.

### 5. *The July 12, 1977 City Council Meeting*

At a July 12, 1977 City Council meeting, lengthy consideration was given to two ordinances relating to Corn's property and to the question of whether his site plan should be approved. One ordinance eliminated mini-warehouses and some other uses from the type of zoning applicable to Corn's property. The other ordinance changed the zoning of Corn's property from commercial to business, a more restrictive classification and one which would not permit mini-warehouses. Both ordinances were enacted or adopted "on first reading" at this meeting, although they did not become law until September of 1977. Before the vote on the two ordinances, Corn was heard through his attorney and through his son, residents of the affected neighborhood were heard, and Council members spoke on the matter. The discussion is instructive to the issue at hand.

Council member Kaufman reviewed for those who had not been present at the July 8, 1977 meeting of the Building Committee what had transpired there. He also said that he had read the Supreme Court's decision in *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), and believed that it authorized the City Council to rezone the property in question in order to protect family values and clean air, secure the blessing of quiet seclusion, and keep the adjoining area a pleasant place for people to live. Referring to what he had heard at the July 8 Building Committee meeting, and to the first ordinance being considered, Council member Kaufman said:

At that meeting that was stated by the people that live there. They bought the condominiums in the area there, hopefully that they would have a place they could look out to from their windows, and have pleasant views, and not to look out into something that perhaps in their opinion is detrimental to their way of life.

I state the facts of this case because it pertains to this. My conclusion, my personal opinion, and after reading this case, I feel the ordinance that has been presented here, in regard to that, is a justified ordinance.

Council member Greenwald then continued the discussion:

We had this meeting on last Thursday [July 8, 1977]. We had quite a gathering of people there, we had a lot of input from the public. And when we listened very carefully, it dawned upon me personally, that there was something unconscionable about the fact that these mini-warehouses were going to be erected.

When the people got up there and spoke, and pointed out the reasons that they objected, and felt this was unfair. It dawned upon me, although I had seen this site plan previously, that there was something wrong here. That this builder, at this time, after he built the single homes, individual dwellings, then he went to the condominiums, put the condominiums up. Wait until he sold out the single homes.

Then went to the condominiums. Completed his condominiums which that area became no longer a certain single dwelling area. Finished his condominiums. Sold out his condominiums.

Then came in and said, I'd like to have a shopping center to the north of 41st St. You remember what happened on that.

Now, he comes in and says, I'd like to have another shopping center on the left of 41st St. That's not enough. Now he says in back of that shopping center on 41st St. to the South, he wants to put up 900 mini-warehouses. 900 mini-warehouses.

When I first learned about this, we asked the person, are you sure its 900? Isn't it 90? He says no, 900. So I looked at the site plan, and I have it in front of me. I think this should be put up on the board. The whole site plan, including the shopping center and the mini plan.

I fully realized that where these mini-warehouses, these 900 mini-warehouses are going to be erected, or supposed to be erected, that that property is zoned C-1. C-1 zoning provides almost any kind of commercial buildings, I understand. There's nothing in C-1 when it was adopted in 1973, which calls for the erection of mini-warehouses. Because in 1973, nobody had by the wildest figment of the imagination had the idea of putting 900 mini-warehouses, which sizes run from 5½ feet wide by 11. To maybe 20 feet, wide.

. . . .

All the people will see from the 2nd floor to the 3rd floor in spite of trees being put up. At this meeting they were discussing, they will put up high trees, olive trees, we'll have exits, more exits, we'll do this, we'll do that.

But the crux of the matter is, you don't build a cesspool then build a tent around it. We say this. That these people who have these homes, and bought these condominiums have as much vested interest in their land as the builder.

I've spoken to real estate agents, subsequent to this, and they tell me, who in the world is going to come in and buy if they want to sell a condominium, on the second floor, and look down at 900 doors. They will say, I'm buying a scene of doors. This is a doorway house, a stock of doors.

I spoke to Mr. Brady [the City Attorney] on this, and right after the meeting, and this was merely a coincidence, right after this meeting when we heard the input from the people, when they pointed out the fact that their homes would be devalued. The extra traffic that will come in there, the possibility of 900 trucks going to each individual mini-warehouse, and loading and unloading. I'm not saying all on one day, but 900 warehouses, 900 trucks.

Council member Greenwald also discussed the history of the C-1 zoning classification that Corn's property then had, which would

have permitted mini-warehouses as a use. That zoning classification came about in 1973 when there were builders on the City Council. Corn was the original owner of the land and had it before it had been zoned commercial. Thus, he could not contend that he had bought the land with a C–1 zoning and that to change the zoning would deprive him of value he had purchased when he obtained the land.

Council member Greenwald concluded his remarks as follows:

I say this thing is unconscionable. Borrowing a term regarding recreational leases. There's something wrong in it. These people are going to lose their valuation, traffic is going to be jammed up, Oakland Park Blvd ... will be widened, and we'll have more traffic. You got 2 shopping centers and then 900 mini-warehouses. We are talking about beautifying our City. Spending money for beautification. We fix up the entrances, with beautification. Now we have this coming into our City.

So I spoke to Mr. Brady [the City Attorney], Mr. Brady said, that the best way to do this, is to change the zoning. We went to court once before with Mr. Corn, and the city in their desire, and the council in their desire, to protect the people who elected them, and put us on the council. To see to their interest. And I say again, I have nothing against builders.

I say to this council, do not table this thing tonight. Vote, to pass it.

The City Council also heard from Corn's attorney who urged rejection of the ordinances and approval of the site plan. The basic theme of his remarks was that changing the zoning of the property and refusing to approve the site plan would violate Corn's rights and lead to legal action. Council member Cohan reacted by characterizing the remarks of Corn's attorney as implied threats, and saying:

I say to this council that the action that is before the council, has the approval of our City Attorney. And I believe we owe as much respect for his opinions, as for any other attorney.

While this has been said before, I concur. That the basic responsibility of this council, is to safeguard the best interests of the citizens of this City.

I urge this council, in making their decision to keep that in mind, as their means of determination.

A discussion between members of the City Council and the City Attorney was followed by a lengthy discussion of setbacks under the ordinance being considered.

The City Council then heard from a number of citizens, all of whom lived in adjoining neighborhoods and all of whom were very much opposed to the mini-warehouse development. A Mrs. Lefkowitz said the planned development would not only devalue their property but the City of Lauderdale Lakes as a whole. She said that the mini-warehouses she had seen were in slum areas, and she repeated a consistent complaint of those who had bought homes, condominiums, or apartments from Corn in that area:

When Mr. Corn's salespeople sold these apartments, they told the buyers that it was intended to be used as a park. But he did not put anything in writing. We therefore hope that we can have the property rezoned, so that we can be proud of the area.

We will gladly sell the condos back to Mr. Corn if he cares to put mini-warehouses throughout the entire Oakland Estates. Another thing, I would like to add, would Mr. Corn's attorney as well as Mr. Corn, like to live next to mini-warehouses?

A Mr. Goldstein commented that the residents of his neighborhood already had enough problems from another shopping center that faced them. He also said:

I was particularly interested in the comments of the attorney for Mr. Corn, in talking about the vested rights of the owners. Corn property. Never mentioning once, the vested rights of the people living there, whom he has sold the homes to. And as the previous speaker mentioned, I venture to say, he never once mentioned to them, when they purchased, that mini-warehouses were going to be built there. I think he owes them a moral obligation. If not perhaps a legal obligation. To see

that they live in the lifestyle he promised them, and I cannot imagine that he for one minute would say, in all honesty that looking out on mini-warehouses, constitutes Florida living.

A Mr. Greenstein and a Mr. Landau also spoke in favor of the ordinances and against Corn's planned mini-warehouses. Mr. Landau described how the development would aggravate existing traffic problems, and he reminded the City Council and Mayor who had elected them:

At the present time, if I go out of my apartment, it takes me about 10 minutes to enter my apartment due to the heavy traffic. I cannot cross to the recreation area, without taking my life in my hands. Now he suggested another shopping area with 900 warehouses. Now, when is this nonsense going to stop? When somebody is going to get killed. Are we going to stop then? It's going to be too late. Let's take this under consideration.

I'd like to speak a word now to our distinguished council and the mayor. I remember that every one of you came knocking at our door to support you. We have done that. Today we are knocking at your doors, for the same purpose, to support us for our welfare, and for the welfare of Lauderdale Lakes.

Another resident, Mr. Goldberg, characterized Corn's attitude as "the public be damned."

After all of this discussion, the City Council unanimously adopted or enacted on first reading the proposed ordinance eliminating storage warehouses as a permitted use in property zoned commercial, such as Corn's land. The Council then discussed and adopted or enacted on first reading the other proposed ordinance, which rezoned the property from C–1 to B–3, a more restrictive zoning classification reserved for business usage.

Even though both ordinances were adopted or enacted "on first reading" at this July 12, 1977 meeting, they would not actually take effect until September of 1977. Apparently for that reason, it was necessary for the City Council to pass on Corn's proposed site plan which could have been approved under the then-existing ordinances. Even where existing ordinances permit such approval, the final decision is in the hands of the City Council.

Council member Kaufman was called upon to summarize the discussion of the site plan that had taken place at the July 8, 1977 Building Committee meeting. He said that the people in the adjoining neighborhood objected to mini-warehouses because they would be "an eyesore, not conducive to the esthetic value of what we are trying to retain in the City of Lauderdale Lakes." He also said that the Building Committee had gone over the entire site plan and into the question of whether the development would create fire and safety hazards.

The Mayor called upon the City Engineer to discuss whether or not Corn's site plan met engineering standards. The City Engineer said that he had submitted letters concerning two aspects of the plan which bothered him "considerably." One problem was that the site plan did not meet applicable parking regulations that had been adopted by the City Council. As laid out in the site plan, the parking spaces would abut directly against the physical building structure, which was not permitted under the regulations. If the parking spaces were put the minimum distance from the building required under the regulations, some of the buildings on the site plan would have to be eliminated. The City Engineer continued, saying:

We also objected in both of our letters, I'll read from one of those. In our opinion the layout of the mini-warehouses presents serious difficulties relating to fire protection, which could jeopardize the life and property of its occupants.

In both cases, I feel that one entry into this center core area is dangerous. Now, it's a little out of the engineering line, but I felt it had to be pointed out. I feel there should be at least two entrances into any type of a structure of this magnitude.

Council member Cohan stated that the City Engineer's objections confirmed two contentions that he had had for some time, that the parking was wrong and that another roadway was needed.

The Mayor pointed out that a number of objections had been made to the plan and that Corn had been given an opportunity to make corrections:

For example, our Fire Chief pointed out that he was sorely concerned about the possibility of even getting a fire truck in and out of those little alleys in there. I have not seen any sort of recommended changes that the proposed developer that's been done on the site plan.

A number of times, the parking situation has been pointed out, not only that it's limited, that perhaps it's insufficient. But that in fact, according to the codes it just does not meet the law. That's been pointed out a number of times.

We've pointed out that there well may be the opportunity for a number of flammable or otherwise dangerous materials to be stored in the thing, and the City does not have any way to properly police what is stored in all those warehouses. That in fact it might generate a substantial safety hazard.

The Council heard from Corn's attorney and from Stephen Corn at this meeting. Both of them said that the Planning and Zoning Board had approved the site plan, but the Mayor corrected them, saying that the Planning and Zoning Board only made recommendations to the City Council and lacked the power to approve anything. The Mayor also pointed out that the vote of the Board had been split two to one. He reiterated his concern about parking and noted that if the City Engineer is correct

that the cars cannot be parked that close to the building then they must be moved 5 feet out from the building, then they will be blocking those streets, and you won't be able to drive cars through there. You certainly will not be able to drive the fire truck down any one of those streets, if that be the case. Then the site plan very obviously has to be completely and totally revised. If that be the case, certainly there is no way it can be approved at this hour with that stipulation.

Council member Greenwald pointed out that the City Council had on numerous occasions disagreed with the Planning and Zoning Board, which is merely an advisory committee. He also said that "the heart of the issue" is whether the builder would be permitted to build 900 mini-warehouses.

After all of that discussion, the City Council voted unanimously not to approve Corn's site plan.

### 6. *The July 19, 1977 City Council Meeting*

At a July 19, 1977 meeting the City Council enacted a moratorium on building permits for property zoned commercial until completion of a study. The study was to be done by the Planning and Zoning Board, in conjunction with the Office of the Consulting City Planner, about the zoning scheme of Lauderdale Lakes, and in particular about commercially zoned property adjacent to residentially zoned property. The Board was charged with preparing a report concerning whether residential property would suffer adverse effects as a result of being situated next to a C–1 zoning district.

### 7. *Results of the Planning and Zoning Board's Study*

The Planning and Zoning Board conducted its study of commercially zoned property within the City and reported to the City Council on December 23, 1977. That report noted that there were two areas of land within the City that were zoned commercial at the time the study was ordered (one of which was Corn's property). Both plots of land were adjacent to residential areas. The Board also reported that orderly planning should allow for a buffer zone between residential areas and commercial areas, an intermediate area where the more restricted business zoning is proper. The lack of such a buffer was found to be a great detriment to persons living in the residential area adjacent to a commercial zone. The Planning and Zoning Board recommended that all commercially zoned areas adjacent to residential areas be rezoned to business districts, so that the business district could serve as a buffer between the commercial area and the residential area.

Mr. Shiff, the City's land use consultant, reported to the Planning and Zoning Board

that, according to the county zoning regulations as adopted by the City, commercial zoning is "[i]ntended for certain repair and other services, wholesale, storage and warehouse uses and sales of large or heavy machinery and equipment." Mr. Shiff observed that "[t]his category is a highly permissive zoning district which requires a buffer between itself and residential areas." With specific reference to Corn's property, he concluded that the old zoning relationship "without a proper stepdown in zoning categories may have an adverse affect [sic] on the surrounding residential properties." He also recommended that the City rezone each of its commercial lots to business use. Mr. Shiff is the same land use consultant who had recommended in 1975 that the City not zone Corn's land in a way that would permit construction of warehouses so close to a residential area.

### 8. *Stephen Corn's Concession and the Unanimous Opinions of All of the Land Use Officials and Experts*

It is undisputed that no other mini-warehouse complex that anyone knew of had ever been built next to a residential area, as the Corns wanted to build this one. Stephen Corn, in addition to being the developer's son, was the person most responsible for planning the mini-warehouse development. In testifying on the issue of damages at the 1991 trial, he explained why this mini-warehouse project would have been different from any other mini-warehouse project he had ever seen or heard of:

> Well, I know I felt this was a unique location for a mini-warehouse project. Most of them were built, even at the time, were in more commercial areas. They weren't in areas that were residential, and, generally speaking, you did not have property zoned correctly for this use in as good a location. Whether there was any property zoned just like this, I have no idea.

Thus, the very reason this project would have been so valuable to the Corns is that no other municipality would have permitted them to build a mini-warehouse project in a residential area. That fact alone establishes that the City's decision was not arbitrary and capricious.

All municipal land use officials who gave an opinion at any time during the municipal process or at trial agreed that what Corn wanted to do defied a fundamental precept of good land use policy: industrial uses such as warehouses should not be permitted immediately contiguous to a residential area. The evidence was overwhelming and virtually undisputed that permitting Corn to build his huge warehouse project would have an adverse effect on residential property values.

### D. THE DISTRICT COURT'S ERRONEOUS ANALYSIS

The heart of the district court's holding that the City violated Corn's substantive due process rights is contained in the following paragraph from its opinion:

> Nonetheless, the Court, upon an independent review of the evidence, holds that the CITY acted arbitrarily and capriciously. The City Council expressed concern for increased traffic, noise, and other adverse effects allegedly created by mini-warehouses. Yet prior to July 12, 1977, no effort was made to investigate mini-warehouses. Moreover, the City Council targeted only the mini-warehouse use for elimination, leaving a number of uses that arguably cause more traffic, noise, and air pollution; no comparison between mini-warehouses and the remaining permitted uses was ever conducted. *See City of Kissimmee v. Ellis,* 431 So.2d 283, 285 (Fla. 5th Dist.Ct.App.1983) (city cannot prohibit proposed use that is no more obnoxious than permitted use). The moratorium seems nothing more than an attempt at *post hoc* rationalization. *See 11126 Baltimore Boulevard v. Prince George's County,* 886 F.2d 1415, 1425 (4th Cir.1989) (supporting evidence must exist when decision made). In short, the City Council was motivated solely by an irrational desire to thwart CORN's plans.

*Corn v. City of Lauderdale Lakes,* 771 F.Supp. at 1569. The quoted paragraph summarizes the district court's analysis, which contains a clearly erroneous factfinding as well as errors of law. The errors of law include creation of a requirement that a formal investigation precede a land use deci-

sion, application of a strict scrutiny standard instead of more deferential review, and misapplication of controlling precedent. We will discuss each of these errors in turn.

### 1. *The Clearly Erroneous Finding About the City's Motivation*

Corn argues that the district court's conclusion that the City Council was motivated solely by an irrational desire to thwart his development plans is a factfinding which we can review only for clear error. Assuming, without deciding, that the statement in question is a factfinding, we have no doubt that it is clearly erroneous. Clear error exists when a reviewing court, after examining all of the evidence, is left with a definite and firm conviction that a mistake has been made. *See, e.g., Concrete Pipe and Products of California, Inc. v. Construction Lab. Pens. Trust,* —— U.S. ——, ——, 113 S.Ct. 2264, 2279, 124 L.Ed.2d 539 (1993); *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *United States v. Roy,* 869 F.2d 1427, 1429 (11th Cir.), *cert. denied,* 493 U.S. 818, 110 S.Ct. 72, 107 L.Ed.2d 38 (1989). The evidence, which we have set out at length, leaves us with the definite and firm conviction that the district court was mistaken not to find that the City's actions were motivated by and substantially related to general welfare concerns about congestion, noise, traffic, aesthetics, safety, property values, and the like. There is no evidence that the City had any bad motive; there is no evidence that it acted without a motive.

As discussed earlier, one week after the City Council had decided to enact the rezoning ordinances and to deny approval to Corn's site plan, it passed a moratorium on building permits for commercially zoned areas to stay in effect until completion of a study by the Planning and Zoning Board about commercial zoning and industrial uses contiguous to residential areas. When completed, that study confirmed the wisdom of the action the City had taken. The district court dismissed the moratorium study as "nothing more than an attempt at *post hoc* rationalization." 771 F.Supp. at 1569. It is understandable why the timing of the study might undermine its utility as a justification for the City's earlier actions. However, it would be illogical to treat the fact that such a study was ordered as evidence that the prior action had been arbitrary. Governmental actions may be undone as well as done, and there was nothing to prevent the City from reconsidering its actions had the study reached a contrary conclusion. Even if we assume that the moratorium and study which confirmed the wisdom of the City's action was done solely in anticipation of litigation, that is not evidence that the City's earlier actions were arbitrary and capricious. The most we are willing to conclude is that the moratorium and study constitute a wash, it is neither evidence of arbitrariness nor evidence of the lack of it. In any event, it does not appear that the district court treated the moratorium and study as affirmative evidence of arbitrariness. We do not, either.

What counts is not the motivation for the moratorium and study, but the motivation for the earlier action adopting the rezoning ordinances and denying the site plan. In respect to those actions, the evidence is overwhelming and undisputed. Indeed, most of it comes from public records, the minutes of official meetings which were admitted at the trial without objection. That evidence uniformly and overwhelmingly establishes that the opposition to Corn's 900–unit mini-warehouse project was based on general welfare concerns of City officials and citizens alike. The evidence shows how those general welfare concerns were expressed to the City Council in a series of public hearings at which both sides were heard. The evidence also establishes that the City Council members became convinced that the project was incompatible with the best general welfare interests of the City and acted accordingly in a rational manner. The evidence is not subject to any other plausible explanation. The district court's contrary factfinding is clearly erroneous. We turn now to the two errors of law that also underlie the district court's holding.

## 2. The Erroneous Holding that a Formal Investigation is Required for Land Use Decisions

■ The district court's holding is based upon the erroneous assumption that government cannot act in land use matters based upon facts gathered at public hearings, but must instead conduct a more formal investigation before acting. The court acknowledged that the City Council had expressed concern for general welfare interests and the adverse effects that a 900–unit mini-warehouse project would have upon those interests. The court then dismissed that important fact, because, it said, before the City acted on July 12, 1977, "no effort was made to investigate mini-warehouses." 771 F.Supp. at 1569. The record shows without dispute that at its June 14, 1977 meeting, the City Council investigated the matter by questioning Stephen Corn concerning the particulars of the development of the proposed warehouses, and it discussed the matter with a member of the Planning Board. At its June 21, 1977 meeting, the City Council discussed the matter at length, again questioned Stephen Corn about the proposed development, and listened to a number of citizens who presented reasons why the development should not be permitted. At the July 8, 1977 joint meeting of the Building Committee and some Council members, at least ten citizens spoke about how the development would impact their neighborhood and the City. The proceedings of that meeting were reported to those Council members who had not been present. At the July 12, 1977 City Council meeting itself, before any action was taken, the City Council heard presentations from Stephen Corn, Corn's attorney, the City Attorney, and a number of citizens. During these meetings, the City Council inquired about and heard the opinions of City officials, such as the City Engineer, the Fire Department Chief, and others. Only after the City Council had investigated the matter at length during these meetings did it take any action.

■ The district court properly rejected the argument that if the City Council blindly followed the will of its constituents who opposed the mini-warehouse project, its action was automatically valid. 771 F.Supp. at 1569. There could be circumstances in which a city's residents wanted a development blocked for illegitimate reasons, such as racial prejudice. But that is not this case. Merely because citizen input may not be a sufficient basis for a rational government land use decision in every instance does not mean it can never be a sufficient basis for such a decision. In most cases it will be. See Greenbriar, 881 F.2d at 1579. Where, as here, citizens consistently come before their city council in public meetings on a number of occasions and present their individual, fact-based concerns that are rationally related to legitimate general welfare concerns, it is not arbitrary and capricious for a city council to decide without a more formal investigation that those concerns are valid and that the proposed development should not be permitted.

The record conclusively demonstrates that the City Council members were presented with abundant information, from all sides, about mini-warehouse projects. In the finest tradition of participatory government, the matter was investigated and resolved in a series of public meetings at which Corn and interested citizens presented information and opinions to the governmental decisionmakers—the members of the City Council. City officials, such as the Fire Chief and the City Engineer, offered advice and were questioned. Various participants drew upon their experience with similar developments and the problems that those developments had caused. As often occurs, some misinformation was presented, some information was corrected, and some was contradicted and disputed; but that is the nature of democratic decisionmaking. The information and views the citizens presented to their government officials at these meetings involved the same general welfare concerns that the Supreme Court and this Court have repeatedly held are rational and permissible bases for land use restrictions: noise, traffic, congestion, safety, aesthetics, valuation of adjoining land, and effect on city services.

It is undisputed that prior to the time the City Council made its decision at the July 12, 1977 meeting, there had been four public meetings in the nature of hearings on the

issue. Stephen Corn, City officials, and other citizens had presented information and opinions to the municipal decisionmakers. The district court's holding that the City Council's action was arbitrary and capricious because, "prior to July 12, 1977, no effort was made to investigate mini-warehouses" amounts to a *per se* rule that no municipality can act rationally on the basis of information gathered at public meetings, but instead must conduct more formal investigations. There is no basis in the Constitution for such a requirement, which would be antithetical to our democratic form of government.

 Corn argued before this Court, and apparently convinced the district court, that insufficient investigation was conducted because the Mayor admitted at trial that he had neither personally visited any other mini-warehouse project at the time the City acted, nor had he sent anyone else from the City to inspect an existing mini-warehouse located three miles from the City. Corn's argument is off the point both factually and legally. Factually, the record shows that the Mayor did not vote on the ordinances or the site plan, and Corn failed to prove that the five City Council members who did vote on it had never visited a mini-warehouse project. More fundamentally, the Constitution does not require on-site inspections as a predicate for land use decisions. *See Federal Communications Commission v. Beach Communications, Inc.*, — U.S. —, —, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993) ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."). It would be absurd to suggest, for example, that a city council could not rationally decide to forbid construction of a nuclear waste facility near a residential area unless the council members had personally inspected a similar facility before they voted. Before the City Council took action in this case, its members learned about mini-warehouses in general and Corn's planned development in particular. The Constitution requires no more investigation than that.

### 3. *The Erroneous Constitutional Standard*

 The district court also erred by applying to the City's actions a strict scrutiny standard of review instead of the deferential review that our decisions require. In concluding that the City had acted arbitrarily and capriciously, the district court reasoned that "the City Council targeted only the mini-warehouse use for elimination, leaving a number of uses that arguably cause more traffic, noise, and air pollution; no comparison between mini-warehouses and the remaining permitted uses was ever conducted." 771 F.Supp. at 1569. That strict scrutiny standard has no place in substantive due process land use doctrine.

The only authority the district court cites for such a heightened standard of review is a Florida appellate court decision that did not even mention substantive due process. *City of Kissimmee v. Ellis*, 431 So.2d 283, 285 (Fla. 5th Dist.Ct.App.1983). Even if that state intermediate appellate court decision had been directly on point, the district court should instead have applied the holdings of *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570 (11th Cir.1989), and other precedent of this Circuit which limits the inquiry to whether the City's action had a rational relationship to a legitimate general welfare concern. No decision of this Court has ever held that the Due Process Clause prevents government from restricting land use to promote the general welfare unless it contemporaneously restricts all land uses in its jurisdiction which "arguably cause" the same or greater adverse effect on the general welfare. We decline to extend the due process clause in such a manner, which would hobble the power of local government to promote the general welfare through land use control.

The district court's criticism of the City for "targeting" mini-warehouses and leaving other uses that "arguably cause" more problems not only reflects application of the wrong legal standard, it also has little or no factual basis in this case. The record is devoid of evidence that when it acted to stop Corn's project the City Council had before it any requests to permit other uses that "arguably cause" the same problems as the mini-warehouses Corn wanted to build. The City retained the right to disapprove any future use that might cause the same problems. Munic-

ipal governments, like people, act to deal with the problems with which they are confronted. There is no basis in the Constitution or in common sense for holding that a government cannot solve a problem with which it is confronted unless its solution solves all future problems that may arise as well. Municipal governments have the power to deal independently with the problems of their cities on an as-needed basis; the Constitution does not require that they address in one all-encompassing action every conceivable problem that could arise.

By applying a level of scrutiny that is far too strict, the district court appears to have put itself in the place of the City Council and made a de novo review of whether it would have taken the same action the City Council did. Such scrutiny impinges upon the right and authority of municipalities to make land use decisions and would alter the allocation of functions between municipal governments and the federal courts. This Court has admonished district courts not to usurp the role of city councils and zoning boards:

> We stress that federal courts do not sit as zoning boards of review and should be most circumspect in determining that constitutional rights are violated in quarrels over zoning decisions. *Raskiewicz v. Town of New Boston,* 754 F.2d 38, 44 (1st Cir.1985) ("federal courts do not sit as a super zoning board or zoning board of appeals"); *Albery v. Reddig,* 718 F.2d 245 (7th Cir.1983) (federal appeals court should not become accustomed to idea that constitutional rights are implicated in quarrel over zoning rules); *Scott v. Greenville County,* 716 F.2d 1409 (4th Cir.1983) (noting reluctance of federal courts to sit as zoning boards of appeal).

*Spence v. Zimmerman,* 873 F.2d 256, 262 (11th Cir.1989); *see also Construction Indus. Assoc. v. City of Petaluma,* 522 F.2d 897, 906 (9th Cir.1975) ("Being neither a super legislature nor a zoning board of appeal, a federal court is without authority to weigh and reappraise the factors considered or ignored by the legislative body in passing the challenged zoning regulation."), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976). In this case, the district court erred by raising the level of constitutional scrutiny to a point where it substituted its judgment for that of the City Council.

### 4. The Application of Precedent

The district court's holding is plainly inconsistent with this Court's *Greenbriar* decision. In that case there was no formal investigation, and the city's decision was based upon "political pressure" from citizen voters who turned out as a crowd to oppose the development. *Greenbriar,* 881 F.2d at 1579. Despite that fact and the apparent lack of any investigation other than public meetings, in *Greenbriar* this Court held that the city's action in denying permission for the development was not arbitrary and capricious. In doing so, we quoted and adopted as "apt" the following analysis about "political pressure" as a basis for such decisions:

> [N]othing is more common in zoning disputes than selfish opposition to zoning changes. The Constitution does not forbid government to yield to such opposition; it does not outlaw the characteristic operations of democratic ... government, operations which are permeated by pressure from special interests.... The fact "that town officials are motivated by parochial views of local interests which work against plaintiffs' plan and which may contravene state subdivision laws" ... does not state a claim of denial of substantive due process.

*Id.* (quoting *Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 467 (7th Cir.1988) (quoting *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 832 (1st Cir.), *cert. denied,* 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982))).

To distinguish the *Greenbriar* decision, the district court relied upon *Wheeler v. City of Pleasant Grove,* 664 F.2d 99 (5th Cir. Unit B 1981) ("*Wheeler I*"), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982), and *A.A. Profiles, Inc. v. City of Ft. Lauderdale,* 850 F.2d 1483 (11th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1743, 104 L.Ed.2d 180 (1989). It said that "the appellate court in both *Wheeler I* and *A.A. Profiles* refused to accept public outcry against a project as evincing a legitimate state interest." 771 F.Supp. at 1569. However, there

are clear distinctions between those two cases on the one hand, and both this case and our more recent *Greenbriar* decision on the other hand.

*Wheeler I* involved a municipality's decision to prevent an apartment complex from being built in a city after a referendum showed overwhelming resistance to it. Unlike the present case, in that case the city's decision "bore no substantial relationship to legitimate concerns for health, safety, welfare, or the general well-being of the community." 664 F.2d at 100. In *Wheeler I*, there was decision by plebiscite; here there was not. In this case, relevant information and legitimate concerns of citizens and officials alike were expressed, discussed, and weighed by the municipal decisionmakers in a process that allowed the developer full input.

*A.A. Profiles* did not even involve a substantive due process issue, so that decision cannot be controlling. It was a procedural due process and just compensation case, 850 F.2d at 1485, two inquiries that differ from a substantive due process analysis. *A.A. Profiles* is also distinguishable from this case because there the city proffered as a basis for its action "threats of violence by area residents." *Id.* at 1488. There certainly were no threats of violence or attempts at physical coercion in this case; all that was involved was public input into a political decision.

The inapplicability of *Wheeler I* and *A.A. Profiles* to this case is shown by the more recent decision of this Court in *Greenbriar*. While various holdings of that decision have been referred to previously, it warrants more detailed discussion because it is a "red cow" case.[2] In *Greenbriar*, the city council refused to change the zoning of a developer's land from single-family residential to "Planned Development District" ("PDD"), which would have permitted multi-family res-

idences, townhouses, accessory structures, and the retail and commercial businesses of a community shopping district. 881 F.2d at 1571–72. One or two public hearings were held before the planning and zoning commission, which ultimately deadlocked on the proposal. After holding its own public hearing on the proposal, the city council rejected it. *Id.* at 1572. Greenbriar, the would-be developer, sued claiming a violation of substantive due process. *Id.* A jury returned a verdict finding that the mayor and city council had been arbitrary and capricious in reaching the decision to deny Greenbriar's PDD zoning application. The district court entered judgment for the developer in accordance with that verdict. *Id.* at 1572–73. This Court reversed. We began our discussion of the legal issues involved in a substantive due process claim by noting:

It has long been established that zoning regulations will not be declared unconstitutional as violative of substantive due process unless they "are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, [394,] 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926).

881 F.2d at 1577. This Court continued, stating:

The relevant question for consideration is whether there existed a rational basis for the City's rejection of Greenbriar's plan, or, phrased in the alternative, whether the City's action bore no substantial relation to the general welfare.

*Id.*

The developer, Greenbriar, argued before this Court that "its proposal for PDD status was well-suited to the needs of the surrounding communities," and that city officials had "acted 'solely on partisan political reasons unrelated to the merits of plaintiffs' propos-

---

**2.** The term "red cow" is used in some legal circles, particularly in Florida, to describe a case that is directly on point, a commanding precedent. *See, e.g., United States v. Kopituk*, 690 F.2d 1289, 1308 (11th Cir.1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2090, 77 L.Ed.2d 300 and *cert. denied*, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). In other states, the same notion of a closely fitting authoritative decision is conveyed by any of the following terms: "spotted dog," "spotted horse," "white horse," "white pony," or "goose" case. *See Jefferson v. Ysleta Indep. School Dist.*, 817 F.2d 303, 305 n. 1 (5th Cir.1987). We choose "red cow" from the metaphorical menagerie because this is a Florida case and because that metaphor is the strongest one, a red cow being more difficult to overlook than the other animals.

al . . . . ' " *Id.* at 1579 (quoting Greenbriar's brief). Greenbriar also pointed to evidence in the record that council members had been subjected to "political pressure" and that some of them were even "scared of the crowd." *Id.* This Court responded as follows:

> [A] planning commission or a City Council is not a judicial forum; it is a legislative body held democratically accountable through precisely the forms of political suasion to which Greenbriar objects. *See Couf v. De Blaker,* 652 F.2d [585,] at 590 (5th Cir.1981) ("Our opinions repeatedly characterize local zoning decisions as 'legislative' in nature"); *South Gwinnett Venture v. Pruitt,* 491 F.2d [5,] at 7 (5th Cir.1974) ("local zoning is a quasi-legislative procedure, not subject to federal juridical consideration in the absence of arbitrary action"). Council members who evaluate a proposal in light of their constituents' preferences do not necessarily overlook what Greenbriar contends to be the "merits" of a particular zoning plan. Here, there is no indication that Council members' attention to citizens' concerns in assessing Greenbriar's zoning plan deprived their decision of a rational basis.

881 F.2d at 1579 (footnote omitted). This Court said, "it is of some relevance" that at the public hearings "all of the representatives of neighborhood associations that spoke were opposed to the granting of PDD status to the property." *Id.* at 1579 n. 17. Exactly the same is true in this case. This Court went on to hold in *Greenbriar* that the Constitution does not forbid government from yielding to political pressure that is characteristic of democratic government, and the fact that municipal officials are motivated by parochial views of local interest does not state a claim of denial of substantive due process, even if those parochial views contravene state laws. *Id.* at 1579.

How closely the *Greenbriar* decision fits this case can be seen from the following paragraph of our *Greenbriar* opinion, which, with only minor modifications for the names of the parties and the specific proposal being considered, could well have been written for this case:

> Greenbriar has failed to demonstrate that local officials did not rationally conclude that the PDD proposal was not in the best interest of the community. Greenbriar contends that its proposal for PDD status was compatible with the traffic, public health and other needs of neighboring areas, and that the plan was modified to incorporate, and/or account for, each of the suggestions or objections of City officials and surrounding property owners. However, review of the record indicates that several members of the City Council simply disagreed with Greenbriar's assessment of the plan's compatibility with the surrounding area, that there existed a rational basis for such disagreement, and that modifications to the plan failed to alleviate their concerns.

*Id.* (footnote omitted). The concerns that had been expressed to and by the city council members in *Greenbriar* were concerns about the effect of the proposed development on the surrounding neighborhoods, including the effect it would have on the value of the property in those neighborhoods and on the levels of traffic. Again, the following paragraph with which this Court ended its discussion of the substantive due process claim in the *Greenbriar* case could just as easily have been written for this case:

> In sum, review of the record indicates that neighborhood representatives offered several reasons for their opposition to the proposed development, and that Council members properly took those views into account in undertaking their own evaluations of the proposal. Greenbriar has failed to show that Council members acted irrationally or arbitrarily in rejecting the PDD rezoning plan. To the contrary, we conclude that the record clearly reflects a rational basis for the City's decision not to rezone the subject property.

*Id.* at 1580 (footnote omitted). *Wheeler I* and *A.A. Profiles* are distinguishable from this case. *Greenbriar* is not. It controls this case and requires that we reverse the district court's holding that there was a substantive due process violation.

### 5. *Summary*

To summarize, we hold that: (1) The district court's factfinding that "the City Council was motivated by an irrational desire to thwart Corn's plans" is clearly erroneous; (2) The Constitution does not require that a particular type of investigation be conducted before a land use decision is made, and reliance upon facts and opinions presented at public meetings does not render the actions of municipal decisionmakers arbitrary and capricious for substantive due process purposes; (3) The proper substantive due process standard relating to land use restrictions is not whether all land uses that arguably cause the same or greater detriment to general welfare interests were restricted or eliminated, but instead "whether there existed a rational basis for the City's [action], or, phrased in the alternative, whether the City's action bore no substantial relation to the general welfare," *Greenbriar*, 881 F.2d at 1577; and (4) Because there was a rational basis for the City's rezoning ordinances and its rejection of Corn's site plan, or phrased differently, because the City's action was substantially related to the general welfare, its actions did not violate Corn's substantive due process rights.

### IV. DISCUSSION OF THE IMMUNITY ISSUE

Our reversal of the district court's holding that the City violated Corn's substantive due process rights renders moot Corn's contentions that the district court erred in calculating damages. Because we remand for further proceedings concerning the remaining just compensation claim, however, Corn's contention that the district court erroneously dismissed the City Council members on legislative immunity grounds is not moot. In its published opinion, the district court entered judgment in favor of the individual City Council members on the grounds that Corn had failed to prosecute his action against them. 771 F.Supp. at 1565. In a later unpublished ruling on Corn's motion to alter or amend the judgment, the court clarified its holding and stated that it had previously dismissed the City Council members solely on grounds of legislative immunity.

We review the holding as clarified and conclude that it is only partially correct.

This Court has extended absolute legislative immunity from suit under 42 U.S.C. § 1983 to purely local legislators in land use and zoning cases. *Brown v. Crawford County*, 960 F.2d 1002, 1011–12 (11th Cir.1992); *Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1409 (11th Cir. 1989); *Hernandez v. City of Lafayette*, 643 F.2d 1188, 1193–94 (5th Cir. Unit A May 1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982). However, not all actions taken by local legislators are subject to absolute immunity. In determining which actions of local legislators are protected by the doctrine of absolute legislative immunity, this Court has drawn the line between legislative actions and administrative actions: "Absolute legislative immunity 'extends only to actions taken within the sphere of legitimate legislative activity.'" *Brown*, 960 F.2d at 1011 (quoting *Finch v. City of Vernon*, 877 F.2d 1497, 1505 (11th Cir.1989)). We have held that actions taken in connection with promulgating zoning ordinances and classifications, even the decision about which zoning classification should be applied to a specific parcel of land, are legislative actions for which local legislators are absolutely immune. *Baytree*, 873 F.2d at 1409 (collecting cases). We have also held that actions taken in connection with the enactment of general moratoriums on development permits are subject to legislative immunity as well. *Brown*, 960 F.2d at 1012. Therefore, the City Council members are absolutely immune from Corn's remaining claim, insofar as that claim attempts to impose liability because of any actions the Council members took in connection with the rezoning and construction moratorium ordinances. The same is not true concerning their actions relating to denial of the site plan.

This Court has held that a land use decision by local legislators which is an "application of policy to a specific party" is not protected by legislative immunity. *Crymes v. DeKalb County*, 923 F.2d 1482, 1486 (11th Cir.1991). In *Crymes*, we held that county commissioners who had denied approval for a development permit were not protected by

legislative immunity, because the decision to deny that permit involved the application of a general policy to a specific party under specific facts. *Id.* at 1485. The actions of the county commissioners in denying approval of Crymes' development permit are impossible to distinguish, insofar as legislative immunity is concerned, from the actions of the City Council members in denying approval of Corn's site plan. The *Crymes* decision thus mandates a holding that the City Council members in this case are not absolutely immune from suit for their actions in connection with the rejection of Corn's site plan. For the reasons we have stated before, they are, however, entitled to absolute legislative immunity for their actions in connection with the three ordinances.

Before he can reach the merits of the just compensation claim against the City Council members, as distinguished from the City, Corn still has another substantial burden to overcome: the doctrine of qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *accord Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). In order to overcome the City Council members' qualified immunity defense, Corn will have to carry the burden of proving that their denial of his site plan violated federal law that was clearly established when that action was taken on July 12, 1977. *Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 3020-21, 82 L.Ed.2d 139 (1984). Because the district court has not had an opportunity to address that issue, we leave it to be determined on remand.

## V. CONCLUSION

The parties have been litigating over the use of 8.5 acres of land for sixteen years.

We hope that this litigation, which has outlasted the plans to develop the land, is nearing an end. What began as four claims has been whittled over the years to one, a just compensation claim, and it is by no means certain that that one claim will survive the remand.[3] Regardless of the outcome, it is in the best interests of all concerned that the outcome be reached sooner rather than later. Toward that end, the district court may wish to consider whether the remaining claim can be adjudicated on the basis of the evidentiary record that already exists. The district court is in the best position to decide that in its sound discretion.

We REVERSE the district court's holding that the City violated Corn's substantive due process rights. We also REVERSE its holding that the City Council members are entitled to absolute legislative immunity, insofar as their actions involving denial of the site plan are concerned, but we AFFIRM its holding that they are entitled to absolute legislative immunity insofar as their actions involving adoption of the ordinances are concerned. We REMAND the case to the district court for further proceedings on the just compensation claim.

HATCHETT, Circuit Judge, concurring specially.

I concur in the majority opinion, but write separately to emphasize that nothing in the opinion should be interpreted as creating a new rule of law that developers will always be unsuccessful in stating a substantive due process claim when a large number of citizens oppose a land use proposal. This is not a case where city council members voted on a zoning proposal after merely counting the number of citizens who opposed the proposal without any consideration of the merits of the proposal. To the contrary, we expressly recognize that "the district court properly rejected the argument that if the City Council blindly followed the will of its constituents

---

3. We leave it to the district court to determine the effect on the just compensation claim of its October 7, 1991 order in response to Corn's motion to amend the judgment, where the court concluded that, "as to the front portion of the Property, '[o]n July 4, 1978, CORN regained all

his sticks in the "bundle of rights commonly characterized as property."' ... This determination necessarily means that the CITY had not 'gone too far' or taken CORN's property, thus requiring just compensation."

who opposed the mini-warehouse project, its action was automatically valid." Majority op. at p. 1387 (citing *Corn v. City of Lauderdale Lakes*, 771 F.Supp. 1557, 1569 (S.D.Fla. 1991)).

Our reversal of the district court's ruling that the city acted arbitrarily and capriciously, is based on the particular facts of this case which are set forth in considerable detail. After reviewing the evidence under the controlling principles articulated in *Greenbriar v. City of Alabaster*, we are convinced that the city council members in this case did evaluate the "merits" of Corn's site plan in addition to the legitimate general welfare concerns of their constituents. *See Greenbriar v. City of Alabaster*, 881 F.2d 1570, 1579 (11th Cir.1989) (holding that "Council members who evaluate a proposal in light of their constituents' preferences do not necessarily overlook what [a substantive due process plaintiff] contends to be the 'merits' of a particular zoning plan."). This is not the case where city council members rejected a land use proposal following one or more orchestrated public hearings where a large number of citizens showed up and mouthed the magic words "noise," "traffic," "congestion," "safety," "aesthetics," "valuation of adjoining land," and "effect on city services." Instead, the record reflects that city council members voted to deny Corn's site plan after finding a rational basis for the general welfare concerns that citizens expressed during the public meetings. *See Greenbriar*, 881 F.2d at 1579–80 (concluding that a developer failed to show that city council members acted irrationally or arbitrarily in rejecting a land use plan, where council members undertook their own evaluation of the proposal and the record indicated a rational basis for citizens' concerns about the effect on surrounding neighborhoods and for their concerns about traffic problems). Moreover, as in *Greenbriar*, we find no indication that the city council members' attention to citizens' concerns in evaluating Corn's site plan deprived their decision of a rational basis. *See Greenbriar*, 881 F.2d at 1579.

Therefore, even though we do not hold that local governments will always prevail in defending substantive due process claims

whenever their zoning decision follows public meetings where citizens express general welfare concerns, we conclude that in this case the city's denial of Corn's land use proposal was not arbitrary and capricious because the record reflects a rational basis for the expressed general welfare concerns.