964 So.2d 629 (2007)
Lemuel ADAMS, Marcia Adams, John Ballard, Melinda Ballard, Robert Barnette, Phillip Carby, Stella Carby, Cindy Cochran, Ricky Cochran, Cindy Simonton Cooke, Randa Jex, Albert Metcalfe, Gay Metcalfe, Mary Mimi Miller, Ronald Miller, Margaret Moss, Carolyne Priester, Robert Stephens, Jacqueline Stephens and Neil Varnell, Appellants,
v.
MAYOR AND BOARD OF ALDERMEN OF the CITY OF NATCHEZ, Mississippi and James D. Gammill, II, Appellees.
No. 2006-CC-00699-COA.
Court of Appeals of Mississippi.
September 11, 2007.
*631 Bruce M. Kuehnle, Philip Elmer Carby, Natchez, attorneys for appellants.
Everett T. Sanders, Robert C. Latham, Natchez, Jeremy Peter Diamond, attorneys for appellees.
Before KING, C.J., GRIFFIS and BARNES, JJ.
KING, C.J., for the Court.
¶ 1. Appellants, a group of residents living near the property that is the subject of this zoning dispute, appeal the trial court's decision to uphold the action of the Mayor and Board of Aldermen of the City of Natchez to re-zone a parcel of real property from O-L (Open Land) to B-2 (General Business) so that the purchaser, James D. Gammill, II could relocate his business, Fat Mama's Tamales. Finding no error, this Court affirms.

FACTS AND PROCEDURAL HISTORY
¶ 2. Fat Mama's Tamales has operated as a restaurant on Canal Street in Natchez, Mississippi, since 1989. The restaurant has grown into a thriving business and is famous for its tamales and margaritas. The restaurant, which features almost exclusively outdoor seating, serves as a tourist destination for the Natchez community.
¶ 3. The dispute arose when the United States Department of the Interior appropriated parcels of land, including the land that houses Fat Mama's Tamales, for use as a national park. After searching for a suitable place to relocate the business, the owners of Fat Mama's, including Appellee James D. Gammill, found an available parcel of land on Canal Street at the corner of Washington Street, approximately one-hundred yards from Fat Mama's original location. The lot, which measures one hundred feet by three hundred twenty feet, was zoned O-L (Open Land)[1] and was used as a paved parking lot. Rezoning the lot to B-2 (General Business)[2] was required in order for Fat Mama's to build and operate the restaurant on this new parcel.
¶ 4. Gammill applied for re-zoning of the lot from O-L to B-2 with the Natchez Metropolitan Planning Commission under *632 Natchez's zoning ordinances. The Commission conducted a hearing on the issue of October 20, 2005, in which Gammill and his attorney presented the case for Fat Mama's. The Commission also heard comments from the public, including several residents of the area who opposed the re-zoning. Following the hearing, the Commission denied the application. At the same meeting, however, the Commission, on its own motion, voted unanimously to re-zone the property from O-L (Open Land) to B-1 (Neighborhood Business).
¶ 5. The residents appealed the Commission's decision to the Mayor and the Board of Aldermen, and Gammill also appealed the denial of his application. The Mayor and Board heard the appeal during a public hearing on November 22, 2005. The residents arranged for a court reporter to transcribe the proceedings. During this hearing, both the residents and Gammill had the opportunity, with their attorneys present, to present their respective cases to the Mayor and Board. Following the presentations of the parties, the Mayor and Board voted unanimously to grant Gammill's application to re-zone the parcel from O-L to B-2. The Mayor and Board then voted unanimously to overturn the Planning Commission's decision to re-zone the parcel from O-L to B-1.[3]
¶ 6. The residents timely appealed the final decision of the Mayor and Board to the circuit court. The circuit court affirmed the decision of the Mayor and Board. In its decision, the trial court noted that the decision of the Mayor and Board was entitled to a presumption of validity. The trial court held that under the limited standard of review applicable to zoning cases, the decision of the Mayor and Board must be affirmed. The trial court concluded that substantial evidence existed to support the re-zoning decision, that the Mayor and Board's determination was "fairly debatable," and that the decision of the Mayor and Board complied with Natchez's zoning ordinances.
¶ 7. The residents have appealed the circuit court's decision to affirm the re-zoning of the parcel from O-L to B-2. On appeal, the residents raise the following issues, which are quoted verbatim from the residents' brief:
(1) Whether the Circuit Judge erred as a matter of law in concluding that the decision of the Mayor and Board of Aldermen to rezone the property was not arbitrary, capricious, discriminatory, illegal, and was supported by substantial evidence.
(2) Whether the Circuit Judge erred in failing to reverse and vacate the decision of the Mayor and Board of Aldermen of the City of Natchez because the rezoning decision of the Mayor and Board of Aldermen violate the zoning ordinances of the City of Natchez.
(3) Whether the Circuit Judge erred in failing to reverse and vacate the action of the Mayor and Board of Aldermen of the City of Natchez for *633 the reason that the rezoning decision of the Mayor and Board of Aldermen constituted spot zoning.
(4) Whether the Circuit Judge erred in failing to reverse and vacate the action of the Mayor and Board of Aldermen of the City of Natchez because the Mayor and Board of Aldermen failed to articulate any findings of fact in support of its rezoning decision.
¶ 8. Because the decision of the Mayor and Board of Aldermen to re-zone the parcel from O-L to B-2 did not violate the zoning ordinances of the City of Natchez and because the decision was not arbitrary and capricious and was supported by substantial evidence, this Court affirms.

STANDARD OF REVIEW
¶ 9. In reviewing zoning cases, the appellate court is bound to the same limited standard of review exercised at the circuit court level. Broadacres, Inc. v. Hattiesburg, 489 So.2d 501, 503 (Miss. 1986). The Court is limited to a consideration of:
whether the action of the board or commission was arbitrary or capricious and whether it was supported by substantial evidence. Perez v. Garden Isle Community. Ass'n, 882 So.2d 217, 219 (Miss. 2004) (citing Broadacres, Inc. v. City of Hattiesburg, 489 So.2d 501, 503 (Miss. 1986)). Thus, zoning decisions will not be set aside unless clearly shown to be arbitrary, capricious, discriminatory, illegal or without substantial evidentiary basis. Perez, 882 So.2d at 219; Carpenter v. City of Petal, 699 So.2d 928, 932 (Miss.1997). . . . Where the point at issue is "fairly debatable," we will not disturb the zoning authority's action. Perez, 882 So.2d at 219; Carpenter, 699 So.2d at 932.
Drews v. City of Hattiesburg, 904 So.2d 138, 140(¶ 5) (Miss.2005).

ANALYSIS
¶ 10. Title 17 of the Mississippi Code Annotated authorizes municipalities to create, implement, and manage comprehensive zoning plans. The purpose of zoning ordinances is to create and maintain a land usage plan that takes into consideration "the character of the district and its peculiar suitability for particular uses" and operates "with a view to conserving the value of buildings, and encouraging the most appropriate use of land throughout such municipality." Miss.Code Ann. § 17-1-9 (Rev.2003).
¶ 11. The municipality also is vested with the authority to amend the zoning plan, and the decision to do so is a legislative function that is entitled to a presumption of validity. See Drews, 904 So.2d at 140(¶ 5) (Miss.2005); Heroman v. McDonald, 885 So.2d 67, 70(¶ 5) (Miss. 2004). Changes in the zoning plan are permissible and are to be expected, as the purpose of the plan is to bring about "coordinated physical development in accordance with present and future needs" of the municipality. Miss.Code Ann. § 17-1-11 (emphasis added). Any changes to a zoning plan, however, must be made after careful consideration because investments in land and property are significant financial decisions, and a landowner should be able to rely upon a zoning plan to maintain the use and value of his property. See Town of Florence v. Sea Lands, Ltd., 759 So.2d 1221, 1228-29(¶ 27) (Miss.2000); Board of Aldermen v. Conerly, 509 So.2d 877, 885 (Miss.1987). Accordingly, the legal standard for amendment of a zoning plan is fairly stringent.
¶ 12. To amend a zoning ordinance, the party seeking the amendment must show, by clear and convincing evidence, *634 "either (1) there was a mistake in the original zoning, or (2) that the character of the neighborhood has changed to such an extent as to justify reclassification, and there was a public need for rezoning." Conerly, 509 So.2d at 883-84. In the present case, Gammill based his application for re-zoning on the second prong of the Conerly test.
1. The decision of the Board was not arbitrary or capricious and was supported by substantial evidence.
¶ 13. The residents argue that Gammill failed to provide the board with clear and convincing evidence "that the character of the neighborhood has changed to such an extent as to justify reclassification, and there was a public need for rezoning." Conerly, 509 So.2d at 883-84. Specifically, the residents argue that Gammill failed to produce the type of specific evidence, as enumerated in Conerly, necessary to show a change in the character of the neighborhood that justifies the re-zoning or a public need for the re-zoning. The resident argue that under Conerly, Gammill cannot successfully defend this appeal unless the record contains, at a minimum "a map showing the circumstances of the area, the changes in the neighborhood, statistics showing a public need, and such further matters of proof so that a rational, informed judgment may be formed as to what the governing board considered." Conerly, 509 So.2d at 885.
¶ 14. In Faircloth v. Lyles, 592 So.2d 941, 945 (Miss.1991), the Mississippi Supreme Court relaxed the strict requirements enumerated in Conerly. The Court cited Conerly as instructive but stated,
[i]n City of Clinton [Conerly] we simply emphasized the necessity of a record showing the factual basis for the findings of the governing body. Absent a record showing sufficient evidence to support the findings, it is inevitable that reversal will follow. On the other hand, while recognizing the desirability of specific findings by the zoning authority on each considered issue, we will not reverse for a lack of such specificity where a factual basis for the action is disclosed.
Faircloth, 592 So.2d at 945. Under this standard, the record is clear that Gammill did demonstrate, by clear and convincing evidence, evidence of a change in the neighborhood and a public need that supported a re-zoning of the parcel from O-L to B-2.
¶ 15. The Mayor and Board heard the presentation of Gammill, in which he stated that the federal government had taken the current site of Fat Mama's Tamales for purposes of establishing a national park. Gammill also stated that he had searched for alternative locations in the area, but could not find any in the historic area in which the restaurant was currently located. Gammill also stated that the proposed site was across the street and approximately one hundred yards from the restaurant's current location. Gammill also discussed his restaurant's reputation as a tourist attraction and his desire to invest $350,000 to $450,000 into the new building so that he could continue the business. Fat Mama's Tamales currently employs six to eight people and contributes approximately $30,000 per year to Natchez's tax revenues.
¶ 16. The Mayor and Board also received a copy of the zoning map. Additionally, the city planner discussed the nature of the area. He stated that with the development of the area, traffic had increased along Canal Street, that areas of Canal Street had been re-zoned to B-2, and that the area was moving toward an area of increased business as the downtown/waterfront areas expanded.
*635 ¶17. All of the above-stated evidence supports the decision of the Mayor and the Board to re-zone the parcel. The zoning map in particular best demonstrates the nature of the area and changes in the neighborhood surrounding the parcel in question. The parcel in question is located at the corner of Canal and Washington streets. Viewing Canal Street only, the zoning map clearly demonstrates that the majority of Canal Street is zoned B-2. Less than a block of R-3 zoning separates the parcel in question from the B-2 district that comprises Canal Street. Additionally, the fact that the new location is approximately one hundred yards down the street from the current location is particularly persuasive.
¶ 18. The city planner clearly stated that Canal Street has always been a mixed-use area, but that recent additions and re-zonings have changed the nature of the neighborhood into more of a business district. The city planner referenced the recent acquisition of land for the national park as an indication that Canal Street is a public use, rather than a residential area.
¶ 19. While the receipt of tax revenue may not be the sole reason for a finding of public need for re-zoning, Fondren N. Renaissance v. Mayor of Jackson, 749 So.2d 974, 979(¶ 16) (Miss.1999), it certainly is a factor for the Mayor and Board to consider. Additionally, the Mayor and Board heard Gammill's statements about the reputation and importance of Fat Mama's Tamales as a tourist attraction and his inability to find land in the Canal Street or downtown areas to relocate the business. The continued success and growth of this area and this particular establishment's role in that success, together with the jobs and tax revenue which Fat Mama's supplies in the area, support a finding of a public need to re-zone this particular parcel.
¶ 20. The residents' opposition and concerns about the re-zoning of this parcel are evidence for the Mayor and Board to consider in making the determination. As it exists now, the parcel is a paved parking lot, and the residents' concerns about noise and traffic are well-founded. Notwithstanding those concerns, this Court finds that the decision of the Mayor and Board is fairly debatable and supported by substantial evidence; therefore, the decision cannot be arbitrary and capricious.
2. Decision complied with the existing zoning ordinances.
¶ 21. The residents argue that the decision of the Mayor and Board violates the zoning ordinances requiring minimum lot areas for the creation of a new district. The residents also argue that to re-zone the parcel to B-2 would require that the parcel abut an existing B-2 district or, if it abuts a residential zone, there must be a one hundred foot buffer zone between the residential area and the business area. The residents submitted copies of the zoning map demonstrating that the proposed parcel is surrounded on three sides by R-3 zoning and that the buffer zone cannot exist because the lot itself only measures one hundred feet by three hundred and twenty feet. For these reasons, the residents contend, the decision of the Mayor and Board is illegal because it fails to follow the requirements of the zoning ordinances.
¶ 22. The zoning ordinance provides that for the creation of a new R-2, R-3, B-2 or I-1 district, the area must contain at least eight acres of land with the following exceptions: "provided, however, that a proposed R-3 district which would abut an existing B-1, B-2, or I-1 district shall be exempt from any requirement of minimum size; provided, further that a proposed B-2 district shall be exempt from any requirements *636 of minimum size." (emphasis added). This section should be interpreted to mean that a proposed amendment re-zoning a parcel to B-2 is permissible, so long as it meets the other requirements listed in the ordinance (error or change in neighborhood or increased need or subdivision of land), regardless of the size of the parcel to be re-zoned. Additionally, the ordinance's description of the nature and uses of a B-2 district state that "[t]here is no minimum required lot area." Accordingly, those size restrictions are not applicable in this case.
¶ 23. The zoning map does indicate that the parcel in question abuts an R-3 district. The map also indicates, however, that the parcel also abuts a B-2 district. As the Mayor and Board heard, this abutting B-2 lot contains a warehouse owned and operated by Isle of Capri. As the trial court pointed out in his opinion, both parties are technically correct on this issue. This Court agrees with that assessment and holds that because the parcel in question does abut an existing B-2 parcel of land, the ordinance does not require a buffer zone, regardless of the fact that the opposite end of the lot abuts an R-3 parcel.
3. The decision of the Board does not constitute "spot zoning."
¶ 24. Spot zoning is defined as "a zoning amendment which is not in harmony with the comprehensive or well-considered land use plan of a municipality." McWaters v. Biloxi, 591 So.2d 824, 828 (Miss.1991). As the Mississippi Supreme Court explained in McWaters,
There is a clear cut distinction between a validly enacted amendatory zoning ordinance and a "spot zoning" ordinance. Not all amendments which change or alter the character of a use district fall within the category of "spot zoning" as we generally understand the term. The term "spot zoning" is ordinarily used where a zoning ordinance is amended reclassifying one or more tracts or lots for a use prohibited by the original zoning ordinance and out of harmony therewith. Whether such an amendment will be held void depends upon the circumstances of each case. The one constant in the cases, as stated by the textwriter, where zoning ordinances have been invalidated due to "spot zoning" is that they were designed "to favor" someone. See 1 Yokley Zoning Law and Practice §§ 8-1 to 8-3 (3rd ed.1965).
Id. This is not a situation in which the Mayor and Board engaged in "spot zoning."
¶ 25. As discussed supra, a view of the zoning map from the perspective of Canal Street clearly demonstrates that the area is predominantly zoned B-2. It is only when viewing the parcel along Washington Street that the issue of "spot zoning" can even be argued. Gammill's site plan, however, demonstrates that all traffic will enter from Canal Street and exit onto Canal Street. Further, the site plan demonstrates that Gammill intends to leave the corner of the lot (100') that fronts Washington Street as "green space." Given the mixed-use nature of this area and the fact that most of Canal Street is zoned for B-2 use, this Court finds that the Mayor and Board's decision does not constitute "spot zoning."
4. The Mayor and Board made sufficient findings of fact to support the re-zoning decision.
¶ 26. The residents argue that the Mayor and Board were required to make specific findings of fact. They assert that Conerly requires such specific findings and that even the relaxed standard cited in Faircloth does not absolve the *637 Mayor and Board because the record does not clearly disclose the facts and evidence to support their decision.
¶ 27. While Conerly did state that "unless the record contains specific finding by such board that one or both these two criteria have been met, and in addition thereto sufficient evidence to support such finding, we will inevitably conclude that the governing board acted arbitrarily, unreasonably and capriciously," Conerly, 509 So.2d at 884. The Faircloth decision relaxed that standard. As the Mississippi Supreme Court stated in Faircloth,
In City of Clinton [Conerly] we simply emphasized the necessity of a record showing the factual basis for the findings of the governing body. Absent a record showing sufficient evidence to support the findings, it is inevitable that reversal will follow. On the other hand, while recognizing the desirability of specific findings by the zoning authority on each considered issue, we will not reverse for a lack of such specificity where a factual basis for the action is disclosed. In this case, the record is replete with factual bases for the Board's findings and its action. The matter was considered on a petition to rezone because of a mistake made in the original zoning or, alternatively, because of changes which occurred since the enactment. The Board was not required to specifically state in its order whether its action rested on one or both of the asserted grounds because the facts supporting the action are adequately reflected in the record of proceedings.
Faircloth, 592 So.2d at 945.
¶ 28. This Court finds that the Mayor and Board did, in fact, adopt findings of fact in the motion to re-zone the property. The transcript of the meeting indicates that the Mayor and Board moved to re-zone the parcel based upon the presentation of the city planner. The city planner's statement included discussion of the nature of the neighborhood as a mixed-use area, the recent zoning changes to increase the amount of general business parcels, increased traffic along Canal Street, and the addition of the national park as evidence that Canal Street is a public area which will attract tourists. The Mayor and Board adopted the city planner's position in making their vote.
¶ 29. With such findings of fact enumerated in the record, the Court is not required to reverse the re-zoning decision. In addition to the city planner's presentation, the record contains evidence outlining the now-public nature of the mixed-use area, the need to maintain businesses such as Fat Mama's in the area, and Gammill's uncontradicted statement that without the re-zoning decision, he would be required to leave the historic area and relocate along the interstate. The record contains sufficient evidence to support the re-zoning decision.
¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF ADAMS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.
NOTES
[1] Although neither party submitted the portion of the zoning ordinance defining Open Land districts during the pendency of the proceedings, from the record, it appears that an Open Land designation was intended as a stop-gap measure to provide parameters for seldom-used properties until a final land-use determination was made. In this case, the property was used as a parking lot, although the record indicates that the lot often stood empty.
[2] The portion of the ordinance defining General Business districts was submitted as part of the record. This district is defined, in part, as follows: "These districts are composed of land and structures occupied by or suitable for furnishing, in addition to the retail goods and services found in neighborhood business districts, the wider range of retail goods and services required by transients and by residents of the trade areas, as well as certain wholesale and warehousing establishments. Located where they have direct access from principal highways, the general business districts usually comprise several blocks or several acres. . . ." Restaurants are included in this designation.
[3] Following the hearing on November 22, 2005, questions arose regarding the adequacy of the notice of hearing. The Mayor and Board re-set the hearing for January 24, 2006, and properly published notice of the hearing. At the January 2006 meeting, the Mayor and Board continued the meeting until February 14, 2006. The Mayor and Board agreed that the record from the November 22, 2005, meeting would be carried forward and left open for additional evidence at the February 14, 2006, meeting. At the February meeting, the parties presented no additional evidence, and following one additional comment from a resident of the area, the record from the November meeting was submitted to the Mayor and Board. The Mayor and Board again voted unanimously to re-zone the property from O-L to B-2.