# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CC-02014-COA

**TINSELTOWN CINEMA, LLC**                                              **APPELLANT**

**v.**

**CITY OF OLIVE BRANCH, MISSISSIPPI**                                **APPELLEE**

DATE OF JUDGMENT:              11/14/2013
TRIAL JUDGE:                   HON. ROBERT P. CHAMBERLIN
COURT FROM WHICH APPEALED:     DESOTO COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        WILLIAM P. MYERS
ATTORNEY FOR APPELLEE:         BRYAN EDWARD DYE
NATURE OF THE CASE:            CIVIL - OTHER
TRIAL COURT DISPOSITION:       AFFIRMED DECISION TO DENY
                               APPLICATION TO DEVELOP
                               COMMERCIAL PROPERTY
DISPOSITION:                   REVERSED AND RENDERED - 03/03/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE LEE, C.J., ROBERTS AND CARLTON, JJ.

### ROBERTS, J., FOR THE COURT:

¶1.     Tinseltown Cinema LLC (Tinseltown) filed an application to build a commercial development that included a movie theater and a restaurant on property in Olive Branch, Mississippi (the City). The Olive Branch Board of Aldermen (the Board) approved Tinseltown's application. A few days later, the City discovered that Tinseltown's property was mistakenly zoned as agricultural and residential (A-R) property, which was contrary to the C-4 "planned-commercial district" designation that appeared on the City's comprehensive zoning plan and official zoning map. Consequently, the Board rescinded its

approval of Tinseltown's application.

¶2.     Approximately one month after the Board had approved Tinseltown's first application, Tinseltown successfully applied to have its property rezoned.  However, the Board denied Tinseltown's second application.  According to the Board, a movie theater was out of character for the neighborhood, and Tinseltown's plan represented undesirable piecemeal commercial development.  Tinseltown appeals.  After careful consideration, we find that the Board's decision to deny Tinseltown's second application was arbitrary and capricious. Therefore, we reverse the Board's judgment and render a judgment for Tinseltown.

## FACTS AND PROCEDURAL HISTORY

¶3.     This case involves Tinseltown's attempt to develop "Tinseltown Plaza" on 8.28 acres of undeveloped property southeast of the intersection of Goodman Road and Pleasant Hill Road in Olive Branch.[1]  Tinseltown Plaza would include a restaurant at the northernmost portion of its property, and a theater south of the restaurant.  The property at issue has approximately 300 feet of frontage along Goodman Road, a five-lane road that is otherwise known as Mississippi Highway 302.

¶4.     As of December 2012, the City's official zoning map and comprehensive zoning plan indicated that the Tinseltown property, as well as the property on its eastern and western boundaries, was zoned C-4.  A series of storage units is on the property east of the Tinseltown property.  The property to the west was vacant at the time Tinseltown filed its

---

[1]  In 1998, the Mississippi Supreme Court described "the intersection of Goodman [Road] and Pleasant Hill Road[]" as "a rapidly developing area." *Miss. Transp. Comm'n v. Bridgforth*, 709 So. 2d 430, 432 (¶6) (Miss. 1998).

application. A large commercial development called the Wedgewood Commons Shopping Center is on the opposite side of Goodman Road. The Wedgewood planned-unit development[2] (Wedgewood) is situated directly south of Tinseltown's property.

¶5. During November 2012, Tinseltown filed its development-plan application[3] with the City's planning commission.[4] Tinseltown's application included a 100-foot natural-landscape buffer and a 200-foot retention-pond buffer between Tinseltown's property and Wedgewood. The Olive Branch Planning Commission (the Commission) met and ultimately voted to recommend that the Board approve Tinseltown's application subject to certain conditions.

¶6. The Board met and considered Tinseltown's application on January 15, 2013. The minutes of the Board's meeting reflect that Tinseltown's application faced opposition from "several" Wedgewood residents. Wedgewood resident Jerry Murdock stated "that other areas in town were more suitable for a theater." Deborah Murdock questioned whether Olive Branch could support two theaters, since another movie theater company had recently announced that it would begin construction of a theater east of Tinseltown's property.

---

[2] "A Planned Unit Development, or PUD, is a modern alternative to traditional zoning classifications. Under a PUD ordinance, the applicant may only build exactly what it proposes to build, thus making a PUD one of the most restrictive types of classifications available." *Fondren N. Renaissance v. Mayor & City Council of Jackson*, 749 So. 2d 974, 982 (¶24) (Miss. 1999).

[3] As required by the City, Tinseltown's application included a project text, a preliminary development plan, and a plat proposal.

[4] The City notes that Tinseltown also submitted an application for a site at the southeast corner of the intersection of Goodman Road and Malone Road. That project was called the "Pooja Cinema" project.

3

However, Laurette Thymes, associate city planner in the City's Planning and Building Department, said that "the planning process would defer to the market as to whether the market could support identical uses at multiple sites within the City[.]"

¶7.    The northern boundary of Steve Heuser's property was adjacent to the southern border of Tinseltown's property.  Heuser was concerned that "the rear of the theater would be a prime spot for burglars."  Heuser was also concerned that the theater would be a nuisance based on the additional light and sound that it would create.  Heuser proposed increasing the landscape buffer by twenty-five feet, building a berm north of the landscape buffer, placing a wall on top of the berm, and planting two rows of staggered evergreens north of the wall. Dawn Heuser opposed the project because "she has two young girls who use the pool in her backyard, and . . . she didn't want a movie theater infringing on her privacy."  She "also noted that her neighborhood was prestigious, and . . . the buffer was inadequate to provide her with security and privacy."  Similarly, Kimberly Remak did not want a theater adjacent to her backyard and her swimming pool.

¶8.    Tinseltown's representative, Hugh Armistead, noted that the 100-foot landscape buffer and the 200-foot detention pond would provide a total buffer of approximately 300 feet – the length of a football field – between Tinseltown's property and Wedgewood.  Additionally, Armistead said that Tinseltown "was willing to add the staggered evergreens to the existing buffer."  Ultimately, the Board approved Tinseltown's application subject to additional buffering between it and Wedgewood, and the addition of five-foot-tall panels on each side

4

of the theater.[5]   That was the final approval necessary before Tinseltown could begin construction.

¶9.    A few days after the Board approved Tinseltown's application, the City discovered for the first time that its comprehensive zoning plan and its zoning map were both incorrect in that Tinseltown's property had never been officially rezoned from A-R to C-4.[6]   On January 28, 2013, the Board held a special meeting and rescinded its approval of Tinseltown's application.  The Board also scheduled a public hearing for February 19, 2013, to consider rezoning Tinseltown's property to C-4.   The Board would also consider Tinseltown's resubmitted application during that meeting.

¶10.    On January 29, 2013, Tinseltown closed on the property.  Two days later, Tinseltown obtained financing for the project.   Tinseltown also began clearing the property so construction could begin.  Meanwhile, nearly two hundred Wedgewood residents signed a petition to oppose rezoning Tinseltown's property.

¶11.    On February 12, 2013, the Commission met and unanimously voted to recommend that the Board rezone the property from A-R to C-4.  Despite the petition from Wedgewood

---

[5]   The dissent finds that the Board's decision was possibly arbitrary and capricious. However, in the very next sentence, the dissent concedes that the Board's decision was based on the mistaken belief that Tinseltown's property was correctly zoned C-4, as indicated on the City's official zoning map and comprehensive zoning plan.  A mistake regarding the property's zoning category is not the equivalent of an arbitrary and capricious decision.  In any event, the Board's decision on January 15, 2013, is not presently at issue.

[6]   The properties were annexed into the City as A-R properties in 1996, and the properties had never been officially rezoned.  The City characterizes the mistake as a clerical error in the database of the zoning-map program.  However, the City does not know exactly how the error occurred.  According to the City, "the clerical error resulted in [Tinseltown's] property and eight other properties in the vicinity being incorrectly labeled and colored as C-4 on the City's zoning map."

residents, there was no significant vocal opposition to rezoning at the meeting.[7]  Instead, the Wedgewood residents objected to having a theater immediately north of their neighborhood. The Commission noted that the Board had previously approved a 100-foot landscape buffer between the project and Wedgewood.  However, Tinseltown had agreed to expand the landscape buffer by an additional twenty-five feet.  Once again, the Commission ultimately voted to recommend that the Board approve Tinseltown's application.

¶12.  Four days before the Board's scheduled meeting, Mayor Sam Rikard wrote a memo to the Board.  Rikard wrote that "there needs to be an overall plan for developing this entire corner similar to the Target properties across the street.  I do not think that we can adequately plan for the future use of this large piece of property in a piece[]meal fashion."  Rikard also noted that Tinseltown did not own the property west of the proposed Tinseltown project, so there was no guarantee that Tinseltown would have direct access to the stoplight at the intersection of Goodman Road and Pleasant Hill Road.  According to Rikard, Tinseltown's property "will have privacy and security issues along the south and entire west property lines that could only be addressed by an earthen berm or a significant fence such as one of brick construction."  Rikard concluded that it was reasonable to rezone Tinseltown's property, but he stated that it would be "short[]sighted" to approve Tinseltown's application.

¶13.  The Board met on February 19, 2013, and rezoned the Tinseltown property from A-R

---

[7] The minutes of the Commission meeting reflect that when the floor was opened to anyone who opposed rezoning, the people who spoke stated their opposition to the theater, rather than rezoning Tinseltown's property to C-4.

to C-4.[8] After rezoning the property, the Board considered Tinseltown's resubmitted application. Although the Board had previously approved Tinseltown's application, Tinseltown modified aspects of it to attempt to alleviate the concerns of the Wedgewood residents. Instead of the five-foot-tall panels that the Board had previously approved, Tinseltown's new application included an eight-foot wall made from "cut-faced blocks." Additionally, instead of the twenty-eight-foot panels that the Board had previously approved, the eight-foot wall would be in a "U shape," running east and west along the northern boundary of the landscape buffer, and continuing north along the eastern and western boundaries of Tinseltown's property. In other words, Tinseltown's second application included more buffering, screening, and security than the application that the Board had previously approved.

¶14. A significant portion of the discussion during the hearing before the Board centered on Danny Butler's property, which bordered less than three hundred feet of Tinseltown's property to the southwest. Like Tinseltown's property, Butler's property had been mistakenly designated as C-4 in the City's zoning map and comprehensive zoning plan, but it had not been officially rezoned from its previous A-R designation. Tinseltown's previous application did not include a buffer between its property and Butler's. Butler and Tinseltown had attempted to reach a compromise regarding the buffer between their properties, but they were unable to finalize an agreement. Thymes commented that Butler's demands were

---

[8] Because more than 150 citizens had signed a petition opposing rezoning of the property, a supermajority vote was required to rezone it. Despite the petition, there was significantly more opposition toward the theater than rezoning. In any event, a supermajority of the Board voted to rezone the property from A-R to C-4.

"more restrictive than what is typically done" where C-4 property is adjacent to A-R property.

¶15.    As previously mentioned, the minutes of the January 15, 2013 meeting reflected that "several area residents" opposed Tinseltown's first application.  However, the people who opposed the project were more organized during the February 2013 Board meeting.  Rich Purvis, the president of the Wedgewood Property Owners' Association asked opponents of the project to stand.  The minutes of the Board's meeting indicate that more than 100 people stood.  Purvis then stated:

> This is a representative portion of the residents of Olive Branch who have supported you through your election campaigns that brought you here to represent them as well as the best interests of the City, and tonight is your opportunity to support them by opposing this project with your vote tonight. This is a bad idea for the City[,] . . . and it's a really bad idea for the local community.

Heuser also voiced his opposition.  Speaking on behalf of himself and other Wedgewood residents, he said "[o]ur opposition to the theater and the concerns we have, if it were to move forward, have not changed. *But what has changed is the number of people here asking you to oppose the theater*."  (Emphasis added).  Heather Fox said, "it's not just Wedgewood that opposes this movie theater, it's a whole number of us that encompass the city.  And while I feel very sad for these residents that they're having to deal with it, I'm concerned about the city as a whole, quite frankly."  Judy Ketchum warned the Board that "a vote for this project, for this investor [and] businessman[,] would be a vote against us, the citizens. You would be voting against the people [who] put you in office."

¶16.    Immediately after Ketchum addressed the Board, Alderwoman Pat Hamilton moved

8

to deny Tinseltown's application. Hamilton's motion passed by a vote of 6-1. The Board's minutes reflect that it denied Tinseltown's application because it was "not in the best interest of the City . . . ." The Board also found that Tinseltown "submitted insufficient evidence of adequate buffering" along the Butler property. Additionally, the Board found that the presence of A-R zoned property near Tinseltown's property made the theater "incompatible with a comprehensive, planned approach for commercial development in the area." Tinseltown appealed to the circuit court, but the circuit court affirmed the Board's decision. Tinseltown appeals.

## ANALYSIS

¶17.    For clarity's sake, we note that the Board's decision to rescind its approval of Tinseltown's first application is not at issue. Instead, Tinseltown claims that the Board erred when it denied Tinseltown's second commercial-development application. According to Tinseltown, the Board's decision was arbitrary.

¶18.    Our analysis of this issue involves some fairly unique considerations. First, there is a distinct difference between a review of a municipal board's interpretation of a statute and its interpretation of an ordinance. Like other questions of law, a board's interpretation of a statute calls for a de novo review. *Ryals v. Bd. of Sup'rs of Pike Cnty.*, 48 So. 3d 444, 448 (¶11) (Miss. 2010). However, we are bound to give "great weight" to a local government's construction of zoning ordinances unless it is manifestly unreasonable. *Roundstone Dev. LLC v. City of Natchez*, 105 So. 3d 317, 321 (¶15) (Miss. 2013).

¶19.    Second, the structure of the City's C-4 zoning ordinance seems to make what would normally be part of the building-permit process a zoning matter, which raises a dilemma

9

regarding the requisite analysis of the issue. We apply a deferential standard of review to an appeal of a zoning decision. *Faircloth v. Lyles*, 592 So. 2d 941, 943 (Miss. 1991). We will affirm a City's zoning decision if substantial evidence supports it. *Riverside Traffic Sys. Inc. v. Bostwick*, 78 So. 3d 881, 885 (¶17) (Miss. 2011). Alternatively, we will reverse an arbitrary decision. *Id*. A decision is arbitrary when it "is not done according to reason or judgment, but depending on the will alone." *Thomas v. Bd. of Sup'rs of Panola Cnty.*, 45 So. 3d 1173, 1181 (¶22) (Miss. 2010).

¶20. However, this is not a traditional appeal of a zoning decision. The Board's decision to rezone Tinseltown's property to C-4 is not at issue. The City's C-4 zoning ordinance gives the Board authority to review what is essentially a proposed site plan. But the Board did not deny Tinseltown's application because a theater is not a permitted or conditional use in a C-4 zone. It would not be unreasonable to view the Board's decision as extraordinarily similar to a denial of a building permit. We do not apply a deferential standard of review to decisions regarding building permits. Instead, the issuance of a building permit is a "purely ministerial" function. *Thompson v. Mayfield*, 204 So. 2d 878, 880 (Miss. 1967). A city does not have the discretion to deny a building permit when an applicant meets the necessary building-code requirements and zoning ordinances. *Id*. As the Mississippi Supreme Court has stated:

> In short, a building code has particular reference to the construction, maintenance and repair of buildings within a municipality. Zoning may restrict the methods of construction and repair of buildings, but a zoning ordinance must be in accordance with a "comprehensive plan" pertaining to the use of land within a municipality.

*Berry v. Embrey*, 238 Miss. 819, 824, 120 So. 2d 165, 168 (1960).

¶21.    It is unclear whether a municipal board's review of a site-plan application is also a ministerial function.  In *Roundstone*, 105 So. 3d at 318 (¶1), the Mississippi Supreme Court reviewed a city's denial of a request to rezone property so the landowner could develop an affordable-housing subdivision.   Roundstone argued that "approval of a site plan is ministerial in nature."  *Id*. at 320 (¶11).  However, the supreme court's resolution of the appeal did not require ruling on the question.  That is, the supreme court held that "[e]ven if site-plan approval is ministerial in nature, as Roundstone contends, approval is not required unless the site plan complies with the zoning ordinance."  *Id*. at (¶12).  Thus, there is no definitive answer regarding whether the Board has a ministerial duty to approve a site plan that conforms to all necessary requirements.  With this framework in mind, we turn to Tinseltown's argument on appeal.

¶22.    Tinseltown argues that the Board arbitrarily denied its second application.  We note that "public boards speak only through their minutes[.]"  *Thompson v. Jones Cnty. Cmty. Hosp.*, 352 So. 2d 795, 796 (Miss. 1977).  Although the minutes memorialized Alderwoman Hamilton's personal concerns, her concerns do not represent the entire Board's reasoning.  "The individuals composing the [B]oard cannot act for the" City on their own.  *Id*.  In other words, one member of the Board does not necessarily speak for the whole.  "A board . . . can act only as a body, and its act must be evidenced by an entry on its minutes."  *Id*.

¶23.    According to the Board's resolution denying Tinseltown's second application, Tinseltown's development plan was not in the City's best interest.  The Board noted that Tinseltown's development plan was "incompatible with a comprehensive, planned approach for commercial development in the area."  The Board further noted that Tinseltown did not

11

present sufficient evidence of adequate buffering adjacent to Butler's property. The Board noted that it relied on its common knowledge of the area.

¶24. The City's C-4 zoning ordinance states that C-4 districts are intended "to provide a mechanism for achieving a greater flexibility in the development of land for commercial purposes[] not otherwise possible in conventional commercial zoning districts." Olive Branch, Miss., Ordinance 11A (Dec. 19, 2000). The C-4 ordinance further states that there are no permitted or conditional uses "in the conventional sense" in a C-4 district. *Id*. at 11E. "The use of the land is considered an integral element of the proposed preliminary development plan." *Id*. However, it is undisputed that a landowner is not prohibited from proposing the construction of a traditional movie theater in a C-4 district. *Id*.

¶25. The Board's decision to deny Tinseltown's application was partially based on the Board's conclusion that a movie theater was out of character for the area, and it was not in the City's best interest to have a theater in that location. The C-4 ordinance requires that the Board consider the potential impact a proposed development would have on the character of the community, but only as it applies to the quality of the development's construction, and the development's architectural compatibility with surrounding commercial developments. However, the Board did find that a movie theater would be architecturally incompatible with other developments in the area. Likewise, the Board did not find that the construction quality of the proposed theater was out of character in the area. Put simply, approximately one month after the Board gave Tinseltown permission to build a movie theater, the same Board found that a movie theater did not belong in exactly the same location.

¶26. "[I]nvestments in land and property are significant financial decisions, and a

12

landowner should be able to rely upon a zoning plan to maintain the use and value of his property." *Adams v. Mayor & Bd. of Aldermen of Natchez*, 964 So. 2d 629, 633 (¶11) (Miss. Ct. App. 2007). No portion of the C-4 zoning ordinance gives the Board the authority to find that a proposed use is simply out of character in a given location when the proposed use is not prohibited by the ordinance. The only portion of the C-4 zoning ordinance that addresses the Board's power to consider the character of an area restricts the Board's review to construction quality and architectural compatibility. But the Board did not relate its decision regarding the character of the area to those qualifiers. It follows that the Board's decision to deny Tinseltown's second application based on the generalized character of the community was arbitrary and manifestly unreasonable.

¶27. The Board also denied Tinseltown's second application based on the concept that Tinseltown's site plan represented "piecemeal" commercial development. As best we can tell, the Board considered Tinseltown's plan to be piecemeal because it did not involve the simultaneous commercial development of more property in the vicinity of the southeast intersection of Goodman Road and Pleasant Hill Road. However, the City does not cite to any portion of its C-4 zoning ordinance that prohibits piecemeal development. Nothing in the ordinance requires the contemporaneous development of a larger parcel of land. Likewise, nothing in the ordinance mandates that a commercial development in a C-4 district must include more than two proposed uses.

¶28. As we noted above, we are required to apply great weight to the Board's construction of the City's zoning ordinances unless the Board's construction is manifestly unreasonable. *Roundstone*, 105 So. 3d at 321 (¶15). The City voted to rezone Tinseltown's property, which

consisted of approximately eight acres. It is manifestly unreasonable to interpret the C-4 zoning ordinance as though the development of C-4 property is impermissibly piecemeal if the development does not include more than two uses, or the development is not developed along with additional property. It is also manifestly unreasonable to prevent a landowner from developing his property in conformity with zoning requirements simply because his property is not large enough to support a larger development. That would essentially render Tinseltown's property useless in and of itself.

¶29. As for the Board's recitation that the individual aldermen used their common knowledge and familiarity with the area when the Board denied Tinseltown's application, it is unclear exactly how the aldermen applied their common knowledge. The most reasonable interpretation is that their common knowledge supported their conclusions that Tinseltown's plan represented piecemeal development and that a theater was out of character in that area. The supreme court has held that members of a municipal board may "call upon their common knowledge and experience in their town" in the context of a decision whether to rezone property. *Id*. at 322 (¶22). "[S]uch considerations are 'sound and practical[,]' and [they] should be respected unless the findings are arbitrary, capricious, and unreasonable." *Id*. (citation omitted). In this case, there is no issue regarding the zoning of Tinseltown's property. Instead, this case centers on the Board's denial of a site-plan application approximately one month after the Board had approved nearly the exact same site plan. We find that the Board's decision was arbitrary. The fact that the Board used its common knowledge to reach its conclusions does not allow the Board to zone property as C-4 and then find that the property is practically unusable because it cannot contain a larger

14

development.

¶30.    The final reason stated for the Board's decision was the lack of a diagram demonstrating an adequate buffer between Tinseltown's proposed development and Butler's property.    To be precise, Butler's property is adjacent to approximately 290 feet of the southwest corner of Tinseltown's property.    Like Tinseltown's property, the City's comprehensive zoning plan and official zoning map mistakenly indicated that Butler's property was zoned C-4.    The dissent finds that Tinseltown's plan "did not fit in with the current zoning of many of the neighboring A-R properties."    The dissent is mistaken.    The "long-term development approach" for the area involves the exclusive creation of commercial developments.    Goodman Road is designated as a planned commercial corridor. Large, multi-use commercial developments exist directly across the street from Tinseltown's property.    A cursory review of the record reveals that the vast majority of property that surrounds Tinseltown's is currently zoned C-4.    In any event, Tinseltown's second application proposed an increased 125-foot landscape buffer at the southernmost portion of its property.    Tinseltown also proposed the construction of a 200-foot detention pond immediately north of the 125-foot landscape buffer.    The landscape buffer and the detention pond would have provided a buffer of approximately 325 feet between the theater and Wedgewood.    The entire border of Butler's property would have been adjacent to either the landscape buffer or the detention pond.    In other words, no portion of Butler's property would have been adjacent to the theater.    The Board did not comment on this aspect of Tinseltown's site plan.

¶31.    We note that the City's design-review ordinance does not provide that any particular

15

buffer must be between C-4 and A-R property. Instead, the buffer requirement between C-4 and A-R properties must be "approved in the Project Text and Preliminary Development Plan." During the February 2013 public hearing before the Board, the buffer requirement was described as "negotiable." Although there are no specific buffering standards that apply where C-4 property is adjacent to A-R property, the "baseline standard" is a "Type 30" buffer. Butler's demands regarding buffering were much more significant than the baseline standard. The C-4 zoning ordinance specifically gives the Board the authority to approve an application "subject to specified conditions." Accordingly, the Board had the option of approving Tinseltown's application subject to the requirement of an adequate, reasonable buffer between Tinseltown's and Butler's properties – particularly where neither building proposed by Tinseltown would be immediately adjacent to any of Butler's property. Additionally, Tinseltown and Butler had been attempting to reach a compromise immediately before the hearing. The dissent concludes that "Tinseltown would have had to go onto neighboring property to make improvements, which the neighbor refused to permit." The dissent is mistaken. A review of the record indicates that Butler would have been content to have improvements on his property, but the City's ordinances prohibited such conduct. The record also indicates that Butler would have been content with an alternative proposal involving the construction of the wall that Tinseltown proposed. Under all of the circumstances discussed above, the lack of a final diagram of the proposed buffer between Tinseltown's and Butler's properties should not have been fatal to Tinseltown's application.

¶32.    As a final note, Tinseltown suggests that the Board's decision was politically motivated. According to Tinseltown, many of the members of the Board faced opponents

16

in an election scheduled three months from the hearing on Tinseltown's second application, and the Wedgewood residents placed increased political pressure on the Board. It is true that "several" Wedgewood residents noted their opposition to Tinseltown's plan during the first hearing, and more than one hundred people stood to note their opposition to Tinseltown's plan during the second hearing. It is also true that some of the people who spoke in opposition to Tinseltown's plan during the second hearing suggested that there would be political consequences if the Board approved Tinseltown's application. It is reasonable to conclude that the Board faced some degree of political pressure. The relatively subjective and undefined standards for approval certainly allow for the possibility of a decision based on political pressure. Even so, there is no direct evidence that political pressure was a factor in the Board's decision to deny Tinseltown's application.

¶33. The dissent interprets this analysis as an implication "that the Board acted capriciously because it took into account the public's concerns." The dissent is mistaken. No portion of this analysis is based on the concept that the Board acted arbitrarily because of the concerns of Wedgewood residents or other citizens of Olive Branch. The dissent's interpretation is also misplaced because the Board did not expressly base its decision to deny Tinseltown's application on the fact that a number of Wedgewood residents expressed displeasure at the possibility of having a theater on the northern border of their neighborhood.

¶34. Although the Board stated that it was not in the City's best interest to have a theater on Tinseltown's property, that recitation does not empower the Board with the unfettered discretion to reject applications based upon the will alone. To reiterate, the Board initially approved Tinseltown's application when everyone involved mistakenly believed that

17

Tinseltown's property was zoned C-4. Through no fault of Tinseltown's, the Board rescinded its approval. The Board then rezoned Tinseltown's property so that it was correctly zoned C-4. Tinseltown submitted another application that included increased buffering and security. However, approximately one month after the Board's initial approval, the Board found that a movie theater was out of character in the area, and it was not in the City's best interest. Although the ordinance authorized the Board to approve Tinseltown's application subject to the requirement of adequate buffering between Tinseltown's property and Butler's, the Board found there was insufficient evidence of the proposed buffering between Tinseltown's and Butler's properties. We find that the Board's decision was arbitrary and manifestly unreasonable. It follows that we reverse the circuit court's judgment and render a judgment in favor of Tinseltown.

¶35. **THE JUDGMENT OF THE DESOTO COUNTY CIRCUIT COURT IS REVERSED, AND JUDGMENT IS RENDERED IN FAVOR OF THE APPELLANT. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, FAIR AND JAMES, JJ., CONCUR. MAXWELL, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES AND ISHEE, JJ.**

**MAXWELL, J., DISSENTING:**

¶36. Because the majority oversteps its bounds by disturbing the Board's decision, I cannot join them.

¶37. Our court is not supposed to interfere with a Board's decision unless it is arbitrary and capricious.[9] And here the Board's decision was neither. Since the Board's decision was

---

[9] *See Hillsdale Terrace, L.P. ex rel. Hillside Terrace I, LLC v. City of Gulfport*, 18 So. 3d 339, 342 (¶5) (Miss. Ct. App. 2009).

18

supported by substantial evidence that Tinseltown's proposed development would negatively impact the general welfare of the City of Olive Branch, I dissent.

### I.    The First Decision

¶38.    If any decision was possibly arbitrary and capricious, it was the Board's original January 15, 2013 decision to approve Tinseltown's Project Text and Preliminary Development Plan (Plan). As the Board acknowledged—and Tinseltown does not dispute on appeal—the January 15, 2013 decision was made under the *mistaken assumption* that the proposed property was zoned C-4 commercial. But both the Board and Tinseltown agree this initial belief was wrong. The property was really zoned A-R agricultural and residential—not commercial. And so were several adjoining properties, which the Board also incorrectly assumed were zoned C-4 when it gave Tinseltown its initial approval.

¶39.    Because the property was not C-4, the Board obviously lacked authority to approve the Plan.[10] Realizing this, the Board quickly notified Tinseltown about the mistake. And the Board gave Tinseltown's owner and attorney the opportunity to be present at the January 28 hearing—the hearing where the Board's mistaken approval was rescinded. As the majority has noted, that specific action is final, binding, and not before us on review.

¶40.    It is also without question that the Board had already officially rescinded approval of Tinseltown's plan *before* the owner decided to forge ahead and purchase and mortgage the property. So what really happened was Tinseltown's owner gambled by buying land that was

---

[10]  The procedures for approving C-4 plans are clear that the required zoning change must occur either before or concurrently with the approval of the Plan, but not after. C-4 Zoning Ordinance, I.3.a., p. 5-54.

not zoned for a movie theater, hoping the Board would later vote to not only zone the property commercial but also approve his project.

## II. The Second Decision

¶41. The Board's February 19, 2013 decision—this time to deny approval of Tinseltown's Plan—lacked the false assumptions and procedural missteps that plagued the first. To the extent the majority seems to question how the Board could have come to a different conclusion just a month later, the answer for changing votes seems obvious.

¶42. First, the Board realized its earlier approval in January was a bad decision based on erroneous information. And while the Board ultimately decided to rezone the Tinseltown property to C-4, many neighboring properties remained A-R—a fact that brought about a whole new set of considerations not contemplated during the January Board vote. Thus, my initial concern with the majority opinion is that it seems to punish the Board for trying to make its decision based on the best information possible. And I simply see no reason why the Board is in any way bound by its earlier decision, which everyone concedes was a nullity.

¶43. But not only was the second decision in February 2013 based on better information, it was also formed after more input from Olive Branch citizens. As the majority acknowledges, one of the more significant differences from the January 2013 meeting was that "the people who opposed the project were more organized during the February 2013 Board meeting." Maj. Op. at (¶15). This leads me to my second concern with the majority opinion—the majority appears to imply that the Board acted capriciously because it took into account the public's concerns.

¶44. There is no question that the citizens of Olive Branch had a right to be heard at the

20

February 2013 meeting. Indeed, before any C-4 Plan can be approved, the Board must hold a public meeting. And following such a hearing, the Board is not limited, as the majority suggests, to considering the impact of the proposed Plan on the character of the community in light of the construction quality and architectural character of the development. Instead, the Board is required to also consider traffic conditions, public utility facilities, the recommendation of the Planning Commission, and any "other matters pertaining to the health, safety, *and welfare of the City*." C-4 Zoning Ordinance, I.3.c(4)(b)-(d) (emphasis added).

¶45. As the Board's minutes reflect, the Board listened to various concerns over traffic, safety, security, and overall property values being negatively impacted by the proposed project. The Board also heard how the proposed project did not fit into the overall, long-term development of the area, as it transitions from a residential to commercial area.

¶46. After review, I simply cannot find the Board acted arbitrarily or capriciously by considering these valid concerns. As the Eleventh Circuit has acknowledged, where citizens come before a city council and "present their individual, fact-based concerns that are rationally related to legitimate general welfare concerns, it is not arbitrary and capricious for a city council to decide . . . that those concerns are valid and that the proposed development should not be permitted." *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1387 (11th Cir. 1993).

¶47. There is an important distinction to be noted. The February 2013 Board meeting was *not* a judicial forum. Rather, it was a public meeting precipitating a legislative decision—democracy in one of its purest forms. And it is not this court's role to interfere

21

with that process when the public is raising legitimate public-welfare concerns. *See id.* In fact, in *Hillsdale Terrace*, this court affirmed a city council's decision to deny a development *because* the decision took into account the viewpoints of neighboring landowners, as well as traffic, safety, and general-welfare concerns. *Hillside Terrace, L.P. ex rel. Hillside Terrace I, LLC v. City of Gulfport*, 18 So. 3d 339, 343-44 (¶¶9-13) (Miss. Ct. App. 2009). I see no reason why the same should not be true here.

¶48. The Board gave several reasons for denying approval of the Plan. One was that the Plan was not in the City's best interest. A second was that Tinseltown provided inadequate information for the Board to evaluate the proposed buffering between its and its neighbor's A-R property. As to the proposed buffering, Tinseltown would have had to go onto neighboring property to make improvements, which the neighbor refused to permit. To me this begs the question of whether this court is really in a better position than the Board to determine the proposed buffering was in fact adequate. I think not.

¶49. A third reason for the denial was that the Plan did not fit in with the current zoning of many of the neighboring A-R properties—properties that were unlikely to change to C-4 in the near future. Consequently, the Board found the Plan was "incompatible with a comprehensive, planned approach for the commercial development of the area." Just how was it arbitrary and capricious for the Board to take into consideration the long-term-development approach for this area? Again, to me it was not.

¶50. When the Board was better informed about the Plan at the February 2013 meeting, the vote was not even close. Six of the seven aldermen voted to deny approval of the Plan. Because the Board's decision is supported with sound reasons and substantial evidence, I

find it is entitled to our deference.

¶51.    Therefore, I would affirm.

**BARNES AND ISHEE, JJ., JOIN THIS OPINION.**