*378 MAXWELL, J.,
dissenting:
36. Because the majority oversteps its bounds by disturbing the Board’s decision, I cannot join them.
87. Our court is not supposed to interfere with a Board’s decision unless it is arbitrary and capricious.[9] And here the Board’s decision was neither. Since the Board’s decision was supported by substantial evidence that Tinseltown’s proposed development would negatively impact the general welfare of the City of Olive Branch, I dissent.

I. The First Decision

38. If any decision was possibly arbitrary and capricious, it was the Board’s original January 15, 2013 decision to approve Tinseltown’s Project Text and Preliminary Development Plan (Plan). As the Board acknowledged — and Tinseltown does not dispute on appeal — the January 15, 2013 decision was made under the mistaken assumption that the proposed property was zoned C-4 commercial. But both the Board and Tinseltown agree this initial belief was wrong. The property was really zoned A-R agricultural and residential — not commercial. And so were several adjoining properties, which the Board also incorrectly assumed were zoned C-4 when it gave Tinseltown its initial approval.
39. Because the property was not C-4, the Board obviously lacked authority to approve the Plan.[10] Realizing this, the Board quickly notified Tinseltown about the mistake. And the Board gave Tinseltown’s owner and attorney the opportunity to be present at the January 28 hearing— the hearing where the Board’s mistaken approval was rescinded. As the majority has noted, that specific action is final, binding, and not before us on review.
40. It is also without question that the Board had already officially rescinded approval of Tinseltown’s plan before the owner decided to forge ahead and purchase and mortgage the property. So what really happened was Tinseltown’s owner gambled by buying land that was not zoned for a movie theater, hoping the Board would later vote to not only zone the property commercial but also'approve his project.

II. The Second Decision

41. The Board’s February 19, 2013 decision — this time to deny approval of Tinseltown’s Plan — lacked the false assumptions and procedural missteps that plagued the first. To the extent the majority seems to question how the Board could have come to a different conclusion just a month later, the answer for changing votes seems obvious.
42. First, the Board realized its earlier approval in January was a bad decision based on erroneous information. And while the Board ultimately decided to rezone the Tinseltown property to CM, many neighboring properties remained AR — a fact that brought about a whole new set of considerations not contemplated during the January Board vote. Thus, my initial concern with the majority opinion is that it seems to punish the Board for trying to make its decision based on the best information possible. And I simply see no reason why the Board is in any way bound by its earlier decision, which everyone concedes was a nullity.
*379 43. But not only was the second decision in February 2013 based on. better information, it was also formed after more input from Olive Branch citizens. As the majority acknowledges, one of the more significant differences from the January 2013 meeting was that “the people who opposed the project were more organized during the February 2013 Board meeting.” Maj. Op. at (¶ 15). This leads me to my second concern with the majority opinion — the majority appears to imply that the Board acted capriciously because it took into account the public’s concerns.
44. There is no question that the citizens of Olive Branch had a right to be heard at the February 2013 meeting. Indeed, before any C-4 Plan can be approved, the Board must hold a public meeting. And following such a hearing, the Board is not limited, as the majority suggests, to considering the impact of the proposed Plan on the character of the community in light of the construction quality and architectural character of the development. Instead, the Board is required to also consider traffic conditions, public utility facilities, the recommendation of the Planning Commission, and any “other matters pertaining to the health, safety, and welfare of the City.” C-4 Zoning Ordinance, I.3.e(4)(b)-(d) (emphasis added).
45. As the Board’s minutes reflect, the Board listened to various concerns over traffic, safety, security, and overall property values being negatively impacted by the proposed project. The Board also heard how the proposed project did not fit into the overall, long-term development of the area, as it transitions from a residential to commercial area.
46. After review, I simply cannot find the Board acted arbitrarily or capriciously by considering these valid concerns. As the Eleventh Circuit has acknowledged, where citizens come before a city council and “present their individual, fact-based concerns that are rationally related to legitimate general welfare concerns, it is not arbitrary and capricious for a city council to decide ... that those concerns are valid and that the proposed development should not be permitted.” Corn v. City of Lauderdale Lakes, 997 F.2d 1369, 1387 (11th Cir.1993).
47. There is an important distinction to be noted. The February 2013 Board meeting was not a judicial forum. Rather, it was a public meeting precipitating a legislative decision — democracy in one of its purest forms. And it is not this court’s role to interfere with that process when the public is raising legitimate public-welfare concerns. See id. In fact, in Hillside Terrace, this court affirmed a city council’s decision to deny a development became the decision took into account the viewpoints of neighboring landowners, as well as traffic, safety, and general-welfare concerns. Hillside Terrace, L.P. ex rel. Hillside Terrace I, LLC v. City of Gulfport, 18 So.3d 339, 343-14 (¶¶ 9-13) (Miss.Ct.App.2009). I see no reason why the same should not be true here.
48. The Board gave several reasons for denying approval of the Plan. One was that the Plan was not in the City’s best interest. A second was that Tinseltown provided inadequate information for the Board to evaluate the proposed buffering between its and its neighbor’s A-R property. As to the proposed buffering, Tinseltown would have had to go onto neighboring property to make improvements, which the neighbor refused to permit. To me this begs the question of whether this court is really in a better position than the Board to determine the proposed buffering was in fact adequate. I think not.
49. A third reason for the denial was that the Plan did not fit in with the current zoning of many of the neighboring A-R properties — properties that were unlikely to change to C-4 in the near future. Con *380 sequently, the Board found the Plan was “incompatible with a comprehensive, planned approach for the commercial development of the area.” Just how was it arbitrary and capricious for the Board to take into consideration the long-term-development approach for this area? Again, to me it was not.
50. When the Board was better informed about the Plan at the February 2013 meeting, the vote was not even close. Six of the seven aldermen voted to deny approval of the Plan. Because the Board’s decision is supported with sound reasons and substantial evidence, I find it is entitled to our deference.
51. Therefore, I would affirm.
BARNES AND ISHEE, JJ., JOIN THIS OPINION.

. See Hillside Terrace, L.P. ex rel. Hillside Terrace I, LLC v. City of Gulfport, 18 So.3d 339, 342 (¶ 5) (Miss.Ct.App.2009).

. The procedures for approving C-4 plans are clear that the required zoning change must occur either before or concurrently with the approval of the Plan, but not after. C-4 Zoning Ordinance, 1.3.a., p. 5-54.